NATIONAL SOLID WASTE MANAGE-MENT ASSOCIATION, Sanifill, Inc., Randy's Sanitation, Inc., Carver Transfer and Processing LLC, and Waste Systems Corporation, Plaintiffs,

v.

Charles W. WILLIAMS, in his official capacity as Commissioner of the Minnesota Pollution Control Agency, Defendant.

Civ. No. 4–94–826.

United States District Court,
D. Minnesota,
Fourth Division.

March 10, 1995.

Timothy R. Thornton, Jack Y. Perry, and Briggs and Morgan, P.A., Minneapolis, for plaintiffs.

Hubert H. Humphrey III, Atty. Gen., State of Minnesota, Jocelyn F. Olson, Asst. Atty. Gen., and Dwight S. Wagenius, Asst. Atty. Gen., St. Paul, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiffs' motion for summary judgment. Based on a review of the file, record and proceedings herein and for the reasons stated herein, the court grants plaintiffs' motion.

## BACKGROUND

The plaintiffs in this action operate landfills located outside the State of Minnesota and a transfer station located in Minnesota.[1] Each plaintiff is a member of the National Solid Waste Management Association ("NSWMA"), also a plaintiff in this action. NSWMA is a trade association of companies engaged in services related to waste management. Defendant Charles Williams ("Williams") is the Commissioner of the Minnesota Pollution Control Agency ("MPCA"). The MPCA is the state agency charged with the implementation and enforcement of laws relating to air, water and land pollution in the State of Minnesota; this includes the implementation and enforcement of Section 115A.47 of the Waste Management Act. Williams and the MPCA will be referred to collectively as "the State" or "Minnesota" throughout this order. Plaintiffs have initiated this lawsuit to challenged Minn.Stat. § 115A.47, effective February 1, 1995. Plaintiffs allege that Section 115A.47 violates the Commerce Clause of the United States Constitution.

Section 115A.47 is a section of the Waste Management Act ("the Act") which was originally enacted in 1980. As part of the Act, the Minnesota Legislature adopted a waste management hierarchy which lists waste management techniques in descending order of preference:

(1) waste reduction and reuse;

(2) waste recycling;

(3) composting of yard waste and food waste;

(4) resource recovery through mixed municipal solid waste composting or incineration; and

(5) land disposal.

Minn.Stat. § 115A.02(b) (1994). Counties in Minnesota are required to adopt comprehensive waste management plans. *See* Minn. Stat. § 115A.46 (1994); Minn.Stat. § 473.803 (1994).[2] The counties must implement these plans through ordinances or contracts. Under the Act, the counties may also adopt waste designation ordinances to implement the waste plans. *See* Minn.Stat. §§ 115A.80– 115A.89 (1994).[3] The waste management

---

1. Plaintiff Sanifill, Inc. is a landfill located in Spirit Lake, Iowa. Sanifill receives 70% of its waste stream from Minnesota. Plaintiff Waste Systems Corporation is a landfill located in Lake Mills, Iowa which receives 96% of its waste stream from Minnesota. Plaintiff Carver Transfer and Processing LLC is a transfer station located in Norwood, Minnesota. A transfer station is an intermediate waste facility in which waste collected from any source is temporarily deposited to await transportation to another waste facility.

2. These comprehensive waste management plans must: (1) evaluate the waste generation habits of a county's population; (2) project the amount of

waste that will be generated in the county over the next decade; (3) describe programs to assure that the county will meet statutorily-established recycling goals; and (4) analyze more environmentally preferred means of safely managing the county's projected waste stream. Minn.Stat. §§ 115A.46, 115A.551, subd. 6, 473.803, 473.8011 (1994).

3. The United States Supreme Court recently struck down a designation ordinance which directed all waste processed or handled in a particular area to a town-sponsored transfer station for processing. *See C & A Carbone, Inc. v. Town of Clarkstown, New York,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In light of this

plans must be approved by the Office of Environmental Assistance.

Section 115A.47 applies to persons or entities who "arrange for management"[4] of waste generated in Minnesota in an "environmentally inferior" manner to that "chosen by the county" in which the waste is generated. Minn.Stat. § 115A.47, subd. 3(a) (1994). The initial starting point, therefore, is the waste management method chosen by the county. Under Section 115A.47, the "waste management method chosen by a county" means:

(1) a waste management method that is mandated for waste generated in the county by section 115A.415, 473.848, 473.849, or other state law, or by county ordinance based on the county solid waste management plan developed, adopted, and approved under section 115A.46 or 458D.05 or the county solid waste management master plan developed, adopted, and approved under section 473.803; or

(2) a waste management facility or facilities, developed under the county solid waste management plan or master plan, to which solid waste generated in a county is directed by an ordinance developed, adopted, and approved under section 115A.80 to 115A.893.

Minn.Stat. § 115A.47, subd. 2(g)(1) and 2(g)(2) (1994). Accordingly, the method chosen by the county is: (1) a method mandated by state law; (2) adopted as part of the county's waste management plan; or (3) a designated facility or its equivalent if the county has a designation ordinance. For example, Section 115A.415, incorporated by reference in Section 115A.47, subd. 2(g)(1), prohibits any individual from delivering un-processed waste to a substandard disposal facility beginning July 1, 1995. Minn.Stat. § 115A.415 (1994). A substandard disposal facility means a disposal facility that does not meet Subtitle D requirements for a new facility. Minn.Stat. § 115A.415 (1994). Further, waste is unprocessed if it has not, "after collection and before disposal, undergone at least one process." Minn.Stat. § 115A.415 (1994). Section 115A.415 therefore prevents a county, through its waste management plan, from "choosing" a facility which only meets Subtitle D standards for existing facilities.

Section 473.848, also incorporated by reference in Section 115A.47, subd. 2(g)(1), requires that all waste generated in the metropolitan area of Minnesota must be processed before it can be delivered to a disposal facility. Minn.Stat. § 473.848 (1994). The reference to Section 473.848 in Section 115A.47 has two implications. First, the requirement that metropolitan waste be processed automatically "chooses" processing as the seven metropolitan counties' method of waste management. Second, Section 473.848 prohibits the landfilling of solid waste generated in the metropolitan area. The parties agree that metropolitan waste cannot be landfilled in Minnesota unless it is certified as unprocessible. Although Section 473.848 also appears to prohibit the landfilling of metropolitan waste outside of Minnesota, the parties agree that metropolitan waste can be transported out-of-state; however, the requirements of Section 115A.47 will apply if the metropolitan waste is landfilled. After processing, or if the metropolitan waste is certified as unprocessible, the waste may only be delivered to a facility which meets Subtitle D requirements

---

ruling, the State asserts that Minnesota counties have suspended enforcement of similar ordinances which direct the flow of waste generated in a county to a facility designated by the county.

4. Under Section 115A.47, "arrange for management" means:

[A]n activity undertaken by a person that determines the ultimate disposition of solid waste that is under the control of the person, including delivery of the waste to a transfer station for transport to another solid waste management facility. Knowledge of the destination of waste by a generator is by itself insufficient for arranging for management unless the genera-tor knows that the destination is an environmentally inferior facility as defined in this section, has the ability to redirect the waste to an environmentally superior facility and ensure its delivery to that facility, and chooses not to redirect that waste.

Minn.Stat. § 115A.47, subd. 2(b) (1994). Plaintiffs argue that the plain language of Section 115A.47 establishes multiple arrangers for each load. The MPCA states, however, that there is only one arranger for each load of waste. The MPCA expects the arranger to be the hauler in most cases; however, where a business self-hauls, the business could be the arranger. The parties' dispute over the number of arrangers, however, does not impact the court's decision.

for new facilities. Minn.Stat. § 473.849 (1994). Thus, Section 473.849 prohibits the delivery of metropolitan waste to a landfill which does not meet Subtitle D standards for a new facility. Section 115A.47, therefore, incorporates in the definition of a method chosen by the county several of the intrastate flow control measures which direct the management of solid waste in Minnesota.

Section 115A.47 also defines the method chosen by a county to include any designation which a county has made pursuant to Section 115A.80–.893. Thus, for the seventeen counties which have adopted designation ordinances, the processing facility which is designated will be treated as the waste management method chosen by the county. Thirty-nine Minnesota counties currently "choose" landfilling through their waste management plan.

Once the county's method of waste management is "chosen," an arranger can haul waste to any facility, notwithstanding its location, as long as the facility the arranger chooses is equivalent, i.e., equal to or superior on the waste management hierarchy, to the method "chosen" by the county without incurring any obligations under Section 115A.47. If an arranger makes a choice which differs from the method chosen by the county, the MPCA evaluates whether that decision is "environmentally inferior" to the method chosen by the county. Section 115A.47 defines "environmentally inferior" as:

> [A] solid waste management method that is lower on the list of preferred waste management methods in section 115A.02 than a solid waste management method chosen by a county or, as applied to a facility, means a waste management facility that utilizes a waste management method that is lower on the list of preferred waste management methods than the waste management method chosen by a county. In addition,

as applied to disposal facilities, a facility that does not meet the standards for new facilities in Code of Federal Regulations, title 40, chapters 257 and 258, is environmentally inferior to a facility that does meet these standards.

Minn.Stat. § 115A.47, subd. 2(d) (1994). Section 115A.47 also defines an "inferior disposal facility" as a solid waste facility that does not meet Subtitle D standards for a new facility. Minn.Stat. § 115A.47, subd. 2(e) (1994). A "superior disposal facility" means a solid waste disposal facility that meets the Subtitle D standards for a new facility.[5] Minn.Stat. § 115A.47, subd. 2(f) (1994).

Under Section 115A.47, if an arranger chooses a waste management method which is "inferior" to the method chosen by the county, the arranger incurs two obligations. First, the arranger must "indemnify and hold harmless each solid waste generator" should the generator be responsible for any future action to recover response costs. Minn.Stat. § 115A.47, subd. 3(a)(1) (1994). Second, if the arranger chooses an inferior method which is a disposal facility, the arranger must provide "proof of financial capability" which means that the arranger must establish a trust fund consisting of: (1) $4.60 per ton ($1.38 per cubic yard) if the waste is delivered to a superior disposal facility; or (2) $21.25 per ton ($6.45 per cubic yard) if the waste is delivered to an inferior disposal facility. Minn.Stat. § 115A.47, subd. 3(b)(1) and (2) (1994). The money in the trust fund may be spent on the approval of the Commissioner of the MPCA for response cost and defense costs incurred by the generators indemnified by the waste management arrangers. Any money remaining in the trust fund after 30 years will be returned to the arranger. An arranger must also pay $1.00 per ton ($.30 per cubic yard) to the Commissioner of the MPCA if the waste is delivered

---

**5.** The court notes that Minnesota has developed standards for its land disposal facilities which exceed the federal regulations established by the Environmental Protection Agency. Federal regulations differentiate between new and existing facilities. Existing facilities may expand vertically within the permitted air space on the land without a liner and leachate collection system. Subtitle D requires that new facilities have a

liner and leachate collection system. Minnesota requires that all Minnesota landfills, whether new or existing, meet Subtitle D standards for new facilities. *See* Minn.Stat. § 115A.415 (1994); Minn.Stat. § 473.849 (1994). Currently, one non-Minnesota landfill in LaCrosse, Wisconsin meets Subtitle D standards for a new facility. Area landfills outside of Minnesota generally meet federal requirements for existing landfills.

to an environmentally inferior facility. Minn. Stat. § 115A.47, subd. 3(h) (1994). The $1.00 per ton ($.30 per cubic yard) represents a non-refundable administrative fee which will be used to implement Section 115A.47. Minn.Stat. § 115A.47, subd. 3(h) (1994).

According to the findings set forth in Section 115A.47, the trust fund payments are necessary because federal law and other States' laws omit any funds for potential response actions. Minn.Stat. § 115A.47, subd. 1(5) (1994). Thus, according to the Minnesota Legislature, the trust fund payments and indemnification provisions of Section 115A.47 are necessary to eliminate the false economies that are presented by landfills. The State argues that landfill tipping fees are "deceptively low" as the fee is based on the immediate cost of landfilling waste, not the potential long term cost generally associated with the clean-up of landfills. Section 115A.47, by establishing the financial capability trust funds, requires arrangers to set aside money for potential future actions. The Legislature specifically found that the cost of these potential future actions amount to approximately 130 percent of the actual costs to respond to contamination. Minn. Stat. § 115A.47, subd. 1 (1994). Under the relevant environmental statutes, a State or the Environmental Protection Agency first looks to the owner of the facility to cover the cost of the contingency actions and then to the generators of the waste. See Minn.Stat. § 115B.03 (1994); Minn.Stat. § 115B.04 (1994). The trust fund payments would therefore only be necessary to cover those costs not covered by the owners of the facilities.

Under the statutory scheme created by the Waste Management Act, including Section 115A.47, there are essentially two waste management methods that can be "chosen" by a county: waste processing and land disposal. The first option, waste processing, encompasses the first four preferred methods of waste management on the waste management hierarchy. The second option, land disposal, essentially encompasses two options: (1) landfilling at a disposal facility which meets federal standards for a "new facility"; or (2) landfilling at a disposal facili-

ty which meets federal standards for an "existing facility." Approximately forty-six counties "choose" waste processing as their primary method of waste management. If an arranger chooses to deliver waste to a disposal facility, rather than to one of the state's processing facilities, Section 115A.47 would be implicated. If the arranger chose a "new facility," Section 115A.47 would require trust fund payments of $4.60 per ton. If the arranger chose an "existing facility," Section 115A.47 would require trust fund payments of $21.25 per ton. The arranger would also be required to indemnify and hold harmless the generator of the waste. Thirty-nine counties "choose" land disposal as their primary method of waste management. As discussed, it would be inconsistent with state law for a county to "choose," through its waste management plan, a facility which only meets the standards for an "existing" facility under Subtitle D. See Minn.Stat. § 115A.415 (1994); Minn.Stat. § 473.849 (1994). Thus, a county who "chooses" land disposal as its primary method of waste management automatically "chooses" to landfill in a facility which meets "new facility" standards. An arranger, in a county which chooses landfill disposal, can therefore transport waste to any facility which meets "new facility" standards without incurring any obligation under Section 115A.47. An arranger, however, who transports waste to a facility which meets the standards for an "existing facility," which is environmentally inferior to the "new facility" chosen by the county, will incur the legal and financial obligations under Section 115A.47. Specifically, the arranger must pay an additional $21.25 per ton into a trust fund and indemnify and hold harmless the waste generator.

As illustrated by the fact that Minnesota requires its existing disposal facilities to surpass federal requirements, Minnesota has a strong commitment to developing superior methods of waste management. Minnesota is also in the forefront of resource recovery waste management. There are several resource recovery facilities within the state which process waste in an "environmentally superior" manner according to the State's waste management hierarchy. Minnesota has invested several million dollars in the

construction of these resource recovery facilities. Local counties have also made substantial investments in these facilities. Initially, these facilities charged a tipping fee of approximately $80 per ton. Counties ensured that arrangers of waste chose these facilities, even though the tipping fees were not competitive, by utilizing designation ordinances which required waste to be managed at the resource recovery facilities. Recent decisions, however, indicate that waste designation is no longer a viable alternative to ensure that the resource recovery facilities receive an adequate stream of waste. *See C & A Carbone v. Town of Clarkstown,* — U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *Waste Systems Corp. v. County of Martin, Minn.,* 985 F.2d 1381 (8th Cir.1993). Consequently, several processing facilities have been forced to lower their tipping fees.[6] The lowest tipping fee is approximately $50 per ton. Several counties have also initiated solid waste management charges to support county-owned facilities or to meet minimum waste guarantees the county has with privately-owned facilities. One county subsidizes its facility through county general funds. At $50 per ton, these processing facilities are generally competitive with landfills in Minnesota which offer tipping fees ranging between $45–70 per ton. Landfills outside of Minnesota, however, continue to offer competitive rates as low as $30 per ton.

## DISCUSSION

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Plaintiffs assert, and defendant agrees, that there are no material issues of fact with respect to plaintiffs' Commerce Clause claim which would make summary judgment inappropriate. The court agrees and concludes that resolution of plaintiffs' Commerce Clause claim by summary judgment is appropriate.

The Commerce Clause of the Unites States Constitution provides that "Congress shall have the Power ... [t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. This clause of the Constitution is also understood to have a negative or dormant application which "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Oregon,* — U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). Thus, the dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The Supreme Court has also recognized, however, the right of states to adopt regulations designed to safeguard the health and safety of its people even though such regulations may incidentally burden interstate commerce. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978). The Supreme Court has held that solid waste is an article of commerce and legislation by the states which restricts its movement is subject to constitutional scrutiny. *Id.* at 622–23, 98 S.Ct. at 2534–35.

In a Commerce Clause challenge, the burden is initially on the plaintiff to show that the legislation is discriminating against interstate commerce on its face or in its purpose or effect. *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *SDDS, Inc. v. South Dakota, et al.,* 47 F.3d 263, 267–68 (8th Cir.1995). Discrimination for purposes of the Commerce Clause is "differential treatment of in-state and out-of-state economic interests that benefit the former and burden the latter." *Oregon Waste,* — U.S. at ——, 114 S.Ct. at 1350. Thus, the court must first determine whether the regulation discriminates against interstate commerce or favors in-state economic interests over their out-of-state counterparts. *Carbone,* — U.S. at ——, 114

---

6. For example, NSP's Elk River resource recovery facility has a tipping fee of $68 per ton.

Wright County's composting facility has a tipping fee of $55 per ton.

S.Ct. at 1682; *Oregon Waste,* —— U.S. at ——, 114 S.Ct. at 1347. If the statute discriminates, it is virtually per se invalid unless the state can prove that the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. *See Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Discriminatory regulations, therefore, must pass the "strictest scrutiny." *Oregon Waste,* —— U.S. at ——, 114 S.Ct. at 1351.

■ If a statute is not facially discriminatory, has only indirect or incidental effects on interstate commerce and regulates evenhandedly, the court applies a balancing test and determines whether the burden on interstate commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under the *Pike* balancing test, if a legitimate local purpose is credibly advanced, "then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. The line that separates these two categories of state legislation is not clear. The Supreme Court has stated, however, that the "critical consideration is the overall effect of the statute on both local and interstate activity." *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). The court therefore turns its inquiry to whether and how Section 115A.47 affects local activity as well as interstate activity.

■ It is undisputed that Section 115A.47 does not facially discriminate against interstate commerce. *See e.g., Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1979) (finding facial discrimination where the state statute prohibited the importation of waste "which originated or was collected outside the territorial limits of the State"). The Supreme Court recognizes, however, that discrimination can occur by subtle means and thus requires a court to examine the overall effect of the challenged legislation. *Philadelphia,* 437 U.S. at 626, 98

S.Ct. at 2536–37 ("[T]he evil of protectionism can reside in legislative means as well as legislative ends."). It is also necessary to examine a regulation for a discriminatory purpose. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 350–351, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977); *SDDS, Inc.,* 47 F.3d at 267–68.

## A. Discrimination

■ Under the Commerce Clause, impermissible discrimination generally takes the form of a regulation which treats similarly-situated entities differently. *Oregon Waste,* —— U.S. at ——, 114 S.Ct. at 1350. Such discrimination subjects the legislation to strict scrutiny. *Id.* The State asserts that Section 115A.47 treats all similarly-situated entities equally. According to the State, Section 115A.47 treats one waste processing facility just like any other waste processing facility or one "new" disposal facility just like any other "new" disposal facility, notwithstanding the facility's location. Plaintiffs argue that Section 115A.47 discriminates as it treats in-state waste management entities differently than out-of-state waste management entities as Section 115A.47 favors in-state processing facilities and disfavors all other waste disposal entities. The court agrees that the Commerce Clause is intended to promote equality between similar in-state and out-of-state interests which compete for Minnesota waste. The court finds, however, that the Commerce Clause does not prevent Minnesota from distinguishing between different competitors in the waste market. In the market of waste disposal, Minnesota has created three different levels of participants: waste disposal, land disposal at a "new" facility and land disposal at an "existing" facility. These distinctions coincide with the waste management hierarchy. Plaintiffs have not challenged the constitutionality of the waste management hierarchy; therefore, the rationality of the hierarchy is not before the court. Under the Commerce Clause, Minnesota is entitled to make certain distinctions between waste processing facilities and landfill disposal. *See Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 401–2 n. 19 (3d Cir. 1987). Under Section 115A.47, once the

county method is chosen, Minnesota waste processing facilities are treated like out-of-state waste processing facilities, as are new disposal facilities and existing disposal facilities. Thus, the court agrees with the State that Section 115A.47 appears to treat similarly situated entities equally. The court's analysis regarding discrimination, however, does not end with the determination that a statute purports to treat entities similarly.

 The presence of a discriminatory purpose also triggers strict scrutiny. *SDDS, Inc.,* 47 F.3d at 267–68.[7] Plaintiffs argue that Section 115A.47 has a discriminatory purpose as it is aimed at directing the flow of waste to local processing facilities from out-of-state landfills. Plaintiffs also assert that Section 115A.47 was enacted to protect local waste management entities from out-of-state competition. The Supreme Court has found a discriminatory purpose behind a regulation which treats everyone equally, yet in practical effect, the in-state interests were either unaffected or benefitted by the regulation. *See Hunt,* 432 U.S. at 350–51, 97 S.Ct. at 2445. In *Hunt,* North Carolina enacted legislation which prohibited individual state grading designs on closed apple containers. *Id.* at 335, 97 S.Ct. at 2437. The regulation permitted the standard U.S. grade labeling system or no labeling system at all. *Id.* This legislation effectively raised the cost of out-of-state sellers who were required to recrate the apples shipped into North Carolina. *Id.* at 349, 97 S.Ct. at 2444. All apple sellers were subject to the legislation; however, the Supreme Court found that sellers of Washington apples were particularly disadvantaged because they were deprived of using the Washington grading system which was more stringent than federal standards. *Id.* at 351, 97 S.Ct. at 2445–46. The Supreme

Court also found that the legislation appeared to apply to all sellers of apples evenhandedly, notwithstanding the origin of the apples. *Id.* at 349, 97 S.Ct. at 2444. Upon close analysis, however, the Supreme Court found that North Carolina businesses were not forced to modify any distributive practices because the North Carolina distributors already used the U.S. grade labeling system. The Supreme Court thus determined that the legislation had a discriminatory purpose in light of the fact that North Carolina distributors were unaffected by the regulation. *Id.* at 351, 97 S.Ct. at 2445–46. North Carolina sellers were also benefitted as Washington sellers lost their ability to capitalize on the competitive and economic advantage Washington apples had earned in the marketplace. *Id.* Thus, impermissible discrimination was found where in-state interests were benefitted or unaffected, while out-of-state interest were substantially burdened.

██ Similarly, the court finds that Section 115A.47 illustrates a discriminatory purpose. The evidence before the court illustrates that Section 115A.47 does not alter the flow of waste in Minnesota. If a county chooses waste processing, an arranger can choose waste processing without incurring any obligation under Section 115A.47. Thus, an arranger will pay between $50–$80 per ton in tipping fees to dispose of waste at one of the State's waste processing facilities.[8] The arranger that chooses waste processing will not incur any obligations under Section 115A.47.

Where the county has chosen waste processing, and an arranger chooses to deliver waste to a landfill in Minnesota, the obligations of Section 115A.47 will apply. Thus, an arranger must add $4.60 per ton to the cost of disposing waste in a Minnesota land-

---

7. The State argues that the referendum in *SDDS, Inc.* is distinguishable from Section 115A.47 as the referendum sought to prevent the flow of solid waste into South Dakota. The State asserts that Section 115A.47 does not prevent waste from flowing into Minnesota. The court agrees that Section 115A.47 does not prevent other states from transporting waste into Minnesota. Regulations which effectively restrict the transportation of in-state waste to out-of-state facilities, however, are subject to the limitations of the Commerce Clause. *See Waste Systems,* 985 F.2d

at 1386 (citing *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)). The State does not respond to the Plaintiffs' argument that a statute which has a discriminatory purpose should be subject to strict scrutiny.

8. The court notes that Section 115A.47, unlike flow control or waste designation, does not direct the flow of waste to any one particular facility; rather, waste is free to move to any waste processing facility.

fill.[9] Minnesota landfills charge a tipping fee ranging from $46–70 per ton. This price, with or without the additional trust fund payments, is generally not competitive with the tipping fees that waste processing facilities are currently charging. Thus, economic considerations will generally not effect the flow of waste where a county "chooses" waste processing and an arranger chooses to landfill in Minnesota.[10] Where the county "chooses" land disposal as its primary method of waste management, an arranger that chooses to waste process in Minnesota will not incur the obligations of Section 115A.47. Thus, Section 115A.47 has little if any effect on the flow of waste in Minnesota.

An arranger's decision to transport waste out of Minnesota, however, is clearly impacted by application of Section 115A.47. For example, where the county "chooses" waste processing, an option which is available for approximately $50–80 per ton, an arranger's decision to landfill in a disposal facility outside of Minnesota increases the cost of this decision by $21.25 per ton to the majority of landfills out-of-state or $4.60 per ton if the waste is shipped to one Wisconsin landfill. The additional amount, added to a tipping fee of approximately $30 for "existing" facilities, increases the cost of out-of-state disposal to approximately the cost of in-state waste processing. If the additional cost of transporting the waste to the out-of-state facility is added into the equation, out-of-state waste disposal loses any competitive advantage which currently exists on the open market.

The fact that Minnesota entities are unaffected or benefitted by Section 115A.47 is further demonstrated by consideration of the flow of metropolitan waste. The Waste Management Act requires that waste generated in any of the metropolitan counties must be processed before it can be landfilled. Minn. Stat. § 473.848 (1994). Minnesota landfills

are prohibited from accepting unprocessed metropolitan waste unless it is certified as unprocessible. Thus, the waste will either flow to the Minnesota processing facilities or a landfill located out-of-state. An arranger who chooses to landfill metropolitan waste will incur the obligation to establish trust fund payments and indemnify the generators of the waste. This obligation is only incurred by the out-of-state landfills. The court concludes, therefore, that the application of Section 115A.47 illustrates an impermissible discriminatory purpose as it leaves in-state waste management entities unaffected or to a certain extent benefitted, while substantially burdening out-of-state waste management entities. As the Supreme Court recently reiterated, "[p]reservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, ——, 114 S.Ct. 2205, 2217, 129 L.Ed.2d 157 (1994). Section 115A.47 thus violates the "cardinal principle that a State may not 'benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* at ——, 114 S.Ct. at 2217.

The State argues, however, that in-state interests are burdened by the application of Section 115A.47 which discounts this discriminatory purpose. Specifically, the State refers to the fact that in-state landfills are subject to the obligations of Section 115A.47 when a county chooses waste processing. The court agrees that "[t]he existence of substantial in-state interests harmed by a regulation is 'a powerful safeguard' against legislative discrimination." *Carbone,* —— U.S. at ——, 114 S.Ct. at 1689 (O'Connor, J. concurring) (citing *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 473 n. 17, 101 S.Ct. 715, 728 n. 17, 66 L.Ed.2d 659 (1981)). Section 115A.47 requires arrangers to make

---

**9.** The $21.25 per ton obligation will not apply in Minnesota, effective July 1, 1995, as all Minnesota landfills must meet the federal standards for new facilities. Minn.Stat. § 115A.415 (1994); Minn.Stat. § 473.849 (1994) Therefore, Minnesota landfills are considered "superior disposal facilities" under Section 115A.47. *See* Minn. Stat. § 115A.47, subd. 2(f) (1994).

**10.** Plaintiffs assert that intrastate flow control enacted by the counties already prevents the flow of waste to Minnesota landfills which is otherwise destined for disposal at waste processing facilities. The record before the court, however, is incomplete on this point. The court notes that such ordinances would support the argument that the flow of commerce in Minnesota is unaffected by Section 115A.47.

trust fund payments if a county chooses waste processing and an arranger chooses landfilling. In light of the realities of the Minnesota waste market, however, Section 115A.47 does not affect the in-state flow of Minnesota waste because Minnesota landfills are not competitive with the waste processing facilities and are prohibited from receiving metropolitan waste.

The court also notes that the only Minnesota interests which are burdened, if at all, by the application of Section 115A.47 are, in the next breath, benefitted by the built-in exemption of the local preference. Thirty-nine counties choose land disposal as their primary method of waste management. Minnesota's articulated purpose for Section 115A.47 is to remove the false economies of landfilling, which in turn has the secondary benefit of encouraging the superior management of waste. The legislative findings set forth in Section 115A.47 assert that:

> it is not in the public interest, in a county that has developed a comprehensive solid waste management plan ... and is implementing that plan, that a solid waste generator continue to accrue liability for contamination from a waste management facility or method that is environmentally inferior to a facility or method chosen by the county for management of the waste generated in the county.

Minn.Stat. § 115A.47, subd. 1(8) (1994). The State argues that the full long-term costs of disposal at landfills is not reflected in the landfill's tipping fee; thus, the cost of landfilling is deceptively low. The State also stresses the environmental and health concerns which it asserts are inherent in all landfills, even "state-of-the-art" landfills which meet Subtitle D requirements for new facilities.

Section 115A.47, however, does not advance its stated purpose of removing the false economies of landfills for the thirty-nine counties which currently chose landfilling as their preferred waste management method. An arranger in a county which has referenced landfilling will not have to establish the trust fund requirements if the landfill is Subtitle D compliant for new facilities nor will the arranger be required to indemnify the generator of the waste. Therefore, simply due to the preference that is accorded the local choice, a Subtitle D new facility is not as environmentally inferior as it was when the county preferred waste processing.

The exception for the local preference has several implications. First, excluding the local choice, in conjunction with the realities of the Minnesota waste market, alleviates any burden that in-state waste management entities may feel under the application of Section 115A.47. *See Government Suppliers Consolidating Serv. Inc. v. Bayh,* 975 F.2d 1267, 1279 (7th Cir.1992) (holding that the regulation was discriminatory as in-state entities were generally unaffected by the regulation and out-of-state entities were substantially burdened). Second, the exclusion constitutes substantial indirect evidence of a discriminatory purpose as the means used to achieve the State's articulated purpose of removing the false economies of landfilling and protecting generators from exposure from future liability connected to landfilling are ineffective with regards to the landfilling of waste in Minnesota. *See SDDS, Inc.,* 47 F.3d at 268–69. Generators are not protected from the potential liability purportedly associated with land disposal when the county chooses landfilling because Section 115A.47 will not apply. This distinction is obviously not based on the fact that landfills do not possess any potentially liability when the county chooses a landfill versus when an arranger chooses a landfill.

Third, under the Commerce Clause, a court "assume[s] that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude that they 'could not have been a goal of the legislation.'" *Clover Leaf Creamery,* 449 U.S. at 463 n. 7, 471 n. 15, 101 S.Ct. at 723 n. 7, 727–28 n. 15 (quoting *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975)). However, "a court is empowered to disregard a legislature's statements of purpose if it considers it a pretext." *Minnesota,* 449 U.S. at 476 n. 2, 101 S.Ct. at 730 n. 2 (J. Powell, dissenting (citing *Dean Milk Co. v. City of Madison, Wis.,* 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95

L.Ed. 329 (1951))). The existence of the exception for the local preference leads the court to conclude that the State's articulated goal is not the purpose of the statute. Rather, the court finds that the legislative history surrounding Section 115A.47 "is brimming with protectionist rhetoric." *SDDS, Inc.*, 47 F.3d at 268–69. For example, the statesmen who sponsored the bill repeatedly mentioned the protection of the waste processing infrastructure as a purpose behind the legislation.[11]

The record demonstrates, and the State freely admits, that Minnesota has managed to capture a great majority of its waste stream. A portion of that waste stream, however, has become increasingly elusive, i.e., solid waste which is otherwise designated to waste processing facilities but which, due to economic realities, finds its way to out-of-state landfills. The court finds that waste otherwise destined for waste processing facilities is the primary concern of the legislature as the legislature even evaluated the impact of Section 115A.47 in terms of the effect the measure would have on the waste being landfilled outside of Minnesota. The State's attempts to restrict this waste from entering the interstate market is precisely the type of economic protectionism which the Commerce Clause is designed to prevent. *See Carbone*, — U.S. at ——, 114 S.Ct. at 1682. Further, the legislature history indicates that Section 115A.47 "give[s] the counties the opportunity to designate and get around the interstate Commerce Clause." While the court finds that Minnesota's past impermissible efforts to regulate waste disposal through designation do not presumptively invalidate any subsequent efforts to legislate in the area of waste, the circumstances of the enactment of Section 115A.47 and the legislative comments suggests that economic protectionism of waste processing facilities was the principle objective of the statute. *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 39, 100 S.Ct. 2009, 2017, 64 L.Ed.2d 702 (1980).

Finally, the exception of the local choice discredits the State's argument that Section 115A.47 regulates evenhandedly and that the effects on interstate commerce are merely incidental. Evenhandedness under the Commerce Clause requires that the burdens of the statute fall evenly on the citizens and noncitizens of the State which enacts the legislation. Thus, at the heart of the requirement that a statute regulates evenhandedly is the proposition that there be no exemptions for in-state interests. The effect of Section 115A.47 is to place the burdens of the regulation upon the interstate market, while excluding similar in-state interests. The court concludes therefore that, in light of the exemption for the local preference, Section 115A.47 is not evenhanded in its application.

■ Further, in support of its argument that the effects of Section 115A.47 are merely incidental, the State asserts that any impact on interstate commerce is small because most waste is already managed in Minnesota. The MPCA estimates that approximately 193,000 tons of Minnesota waste per year, or four percent of the total waste generated in Minnesota, is managed outside of the State. The court finds that this argument misconstrues the nature of the incidental impact on interstate commerce that is permissible. *See Waste Systems*, 985 F.2d at 1387 (holding that the loss of 10,400 tons annually was not incidental). The volume of interstate commerce impacted is not probative of whether the impact is incidental. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 363 n. 4, 112 S.Ct. 2019, 2025 n. 4, 119 L.Ed.2d 139 (1994) ("The volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination of whether a state has discriminated against interstate commerce."); *Wyoming v. Oklahoma*, 502 U.S. 437, 455–57, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992).

■ The State also argues that the fact that Section 115A.47 will have the effect of prohibiting arrangers from disposing of waste out-of-state is merely an incidental

---

11. Senator Merriam stated that "Lastly, and not inconsequentially, but we can't mention it, is the fact that we have some concern about infrastructure investments that have been made by our local units of government and some need to protect that." Senate Environment Committee Minutes for March 31, 1994.

effect of the statute. Legislation, however, that prevents the transportation of waste out-of-state or overtly blocks the flow of interstate commerce at the border is the clearest example of the protectionism that the dormant Commerce Clause was designed to prevent. *See Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535. The consequential effect of stopping waste at the border cannot be incidental. The court finds, however, that it is impossible to tell from the record whether Section 115A.47 has the discriminatory effect of stopping the flow of waste at the borders. The court notes that such an effect would subject Section 115A.47 to strict scrutiny.

The court concludes that Section 115A.47 has a discriminatory purpose as in-state entities are unaffected or benefitted by Section 115A.47, the means used by the state are relatively ineffective in advancing the stated objectives of the statute, the legislative history is replete with evidence of protectionism and Section 115A.47 is neither evenhanded in its application nor incidental in its effect. Accordingly, the court concludes that Section 115A.47 shall be subject to strict scrutiny.

## B. Application Of Strict Scrutiny

In light of the discriminatory purpose behind Section 115A.47, the court applies the strictest scrutiny. If state legislation is discriminatory and is subject to the "strictest scrutiny," a "virtually per se rule of invalidity" applies. *Oregon Waste,* —— U.S. at ——, 114 S.Ct. at 1351 (quoting *Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535). Under strict scrutiny, "the burden falls on the State to justify [the measure] both in terms of the local benefits flowing from the statute and the unavailability of a nondiscriminatory alternative adequate to preserve the local interests at stake." *Oregon Waste,* —— U.S. at ——, 114 S.Ct. at 1351; *Hunt,* 432 U.S. at 353, 97 S.Ct. at 2446.

First, in order to survive strict scrutiny, the State must demonstrate that Section 115A.47 has a legitimate purpose, unrelated to economic protectionism, which provides local benefits. The stated purpose of Section 115A.47 is to ensure that landfill tipping fees reflect any potential long term environmental liability that generators of waste may incur

through the decision to landfill waste. The trust fund payments therefore have a two-fold purpose according to the State. First, the additional cost added to the "deceptively low" tipping fee will allow arrangers to make waste management decisions according to the long term environmental cost of the chosen method. Second, the trust fund payments will ensure that monies are available if the potential liability becomes a reality in the future.

Plaintiffs assert that, as Section 115A.47 only applies to out-of-state landfills, it does not protect citizens from Minnesota superfund liability; rather, it only protects Minnesota citizens from potential liability arising *outside* of Minnesota. Plaintiffs argue that this is an extraterritorial exercise of Minnesota's police power. *See Cotto Waxo Co. v. Williams,* 46 F.3d 790, 793 (8th Cir.1995) (stating that an "[e]xtraterritorial reach invalidates a state statute when the statute requires people or businesses to conduct their out-of-state commerce in a certain way."). Plaintiffs also argue that this is an arbitrary exercise of the State's police power as the trust fund payments are not tied to the specific environmental soundness of any particular facility and trust funds payments are not established when the county exempts a Minnesota landfill. The court agrees that, as a general proposition, a state has "every right to protect its residents' pocketbooks as well as their environment." *Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2537. The court need not decide, however, whether it is a legitimate state interest to address liability which may arise in other states as the court finds that Section 115A.47 does "remarkably little" to further the State's goal, if legitimate, as thirty-nine counties choose landfilling as their preferred method of waste management. *See Hunt,* 432 U.S. at 353, 97 S.Ct. at 2446–47. Where the county chooses landfilling, the protections of Section 115A.47 simply do not apply and Minnesota generators are not protected.

Even if the State did carry its burden of establishing a legitimate purpose, in order to survive strict scrutiny, the State must demonstrate that the legitimate purpose cannot be accomplished through less discriminatory

**1380**

means. The State has not produced any evidence that the stated purpose of protecting Minnesota generators from future liability cannot be served as well in a nondiscriminatory manner, i.e., without exempting the local preference. Plaintiffs also assert that less burdensome alternatives are available to ensure that waste processing facilities receive an adequate supply of waste. For example, the Supreme Court in *Carbone* identified general taxes as a less burden alternative for subsidizing waste processing. *Carbone*, —— U.S. at ——, 114 S.Ct. at 1684. Thus, as nondiscriminatory methods are available, the court concludes that the State has failed to carry its heavy burden of establishing a legitimate purpose, unrelated to the economic protection of in-state waste management methods, which cannot be advanced in a nondiscriminatory manner.

### CONCLUSION

Federal and state laws require the states and their political subdivisions to manage waste in the most environmentally superior method as possible. Accordingly, Minnesota has made substantial and commendable efforts to manage waste in a manner that protects its citizens and the environment. Environmentally superior methods, however, are expensive and, as the State admits, arrangers make waste management decisions based on cost. The protection of in-state interests at the expense of out-of-state interests, however, is offensive to the Commerce Clause.

Based on a review of the record, file and proceedings herein, as well as the reasons stated above, the court finds that Section 115A.47, although facially neutral, has a discriminatory purpose which requires the application of strict scrutiny. As the State has not met its burden to establish that its legitimate purpose cannot be advanced through nondiscriminatory means, the court concludes that Section 115A.47 is unconstitutional. Accordingly, **IT IS HEREBY ORDERED** that Section 115A.47 is unconstitutional. Further, **IT IS ORDERED** that plaintiffs' motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**