No. 95-1107

Independent Charities of          *
America, Inc.; Local              *
Independent Charities, Inc.;      *
National United Service           *
Agencies, Inc.; Environmental     *
Federation of America, doing      *
business as Earth Share,          *
                                  *
              Appellants,         * Appeal from the United States
                                  * District Court for the
     v.                           * District of Minnesota
                                  *
State of Minnesota, Wayne         *
Simoneau, in his capacity as      *
Minnesota Commissioner of         *
Employee Relations,               *
                                  *
              Appellees.          *

_____

          Submitted:  October 20, 1995

             Filed:  April 29, 1996
          _____

Before McMILLIAN, ROSS and BOWMAN, Circuit Judges.
          _____

McMILLIAN, Circuit Judge.

     Independent Charities of America, Inc., Local Independent Charities,
Inc., National United Service Agencies, Inc., and Environmental Federation
of America, Inc., d/b/a Earth Share (collectively plaintiffs) appeal from
a final order entered in the United States District Court[1] for the District
of Minnesota granting summary judgment in favor of the State of Minnesota
and

---

[1]The Honorable James M. Rosenbaum, United States District
Judge for the District of Minnesota.

Linda Barton, in her capacity as Minnesota Commissioner of Employee Relations (collectively the State defendants)on plaintiffs' claims that certain statutory amendments limiting access to the Minnesota Employee Combined Charitable Campaign (Campaign) violate the First Amendment, federal equal protection and substantive due process, and the Commerce Clause. Independent Charities of America, Inc. v. Minnesota, No. 4-94-CV-483 (D. Minn. Dec. 16, 1994). For reversal, plaintiffs argue that the district court erred in holding that (1) the exclusion of non-local fundraisers from the Campaign did not violate plaintiffs' First Amendment right to free speech; (2) the exclusion of non-local fundraisers from the Campaign did not violate their rights to equal protection and due process; and (3) the State of Minnesota was a "market participant" so as to exempt the challenged amendments from scrutiny under the Commerce Clause. For the reasons discussed below, we affirm the order of the district court.

## I. Background

The Campaign is an annual fund raising drive whereby a state employee may elect to have a contribution deducted from his or her paycheck and paid to a registered combined charitable organization. See Minn. Stat. § 309.501(1)(e) (1994). The Campaign is conducted in the state workplace during working hours. According to Minn. Stat. § 309.501(3), only charitable federations which have been recognized by the Campaign as Registered Combined Charitable Organizations (RCCOs) are eligible to participate in the Campaign. A charitable federation seeking to participate in the Campaign on behalf of its member charities must meet the statutory criteria for RCCOs set forth in Minn Stat. § 309.501(1).[2]

---

[2]Before the 1993 and 1994 amendments at issue in the present case, § 309.501(1) provided in pertinent part:

Subdivision 1. Definitions.

"Registered combined charitable organization" means an organization

(1) which is tax exempt under Section 501(c)(3) of the Internal Revenue Code . . . and to which contributions are deductible under Section 170 of

-2-

In 1993, the Minnesota Legislature amended § 309.501 to provide more restrictive criteria for participation in the Campaign by RCCOs and their individual member charities. These amendments rendered plaintiffs ineligible for participation in the 1994-95 Campaign.[3] Three aspects of the 1993 amendments are challenged by plaintiffs. First, the Legislature amended Minn. Stat.§ 309.501(1)

the Internal Revenue Code;

(2) which secures funds for distribution to ten or more charitable agencies in a single, annual consolidated effort;

(3) which is governed by a voluntary board of directors which represents the broad interests of the public;

(4) which distributes at least 70 percent of its total campaign income and revenue to the designated agencies it supports and expends no more than 30 percent of its total income and revenue for management and general costs and fund raising costs;

(5) and each designated agency supported by the recipient institution devotes substantially all of its activities directly to providing health, welfare, social, or other human services to individuals;

(6) and each designated agency supported by the recipient institution provides health, welfare, social, or other human services, in the community and surrounding area in which the recipient institution's fund drive takes place; and

(7) which has been registered with the commissioner of commerce in accordance with this section.

Minn. Stat. § 309.501(1) (1992).

[3]The Legislature provided a compliance waiver of one year for those RCCOs which could not meet the more stringent criteria if they had participated in the 1992-93 Campaign.

-3-

to require participating RCCOs to be "governed by a local, independent, voluntary board of directors which represents the broad interests of the public and 90 percent of the directors of the governing board live or work in the community or surrounding area." Act of May 14, 1993, ch. 192, § 86, 1993 Minn. Laws 711, 767; Jt. App. 71. Because plaintiffs did not have local boards of directors, they did not qualify as RCCOs under the 1993 amendments. Second, the Legislature established a local presence requirement for the RCCOs' member charities. As amended in 1993, § 309.501(1)(b)(6) required that individual member charities, or "affiliated agencies,"[4] be "incorporated in Minnesota or headquartered in the service area in which the state employee combined charitable campaign takes place." Id. As a result of this provision, some affiliated agencies became unable to participate in the 1994-95 Campaign. Finally, the Legislature added a local spending requirement to § 309.501(1) , requiring that each affiliated agency must provide "all or substantially all of its health, welfare, social, or other human services, in the community and surrounding area in which the state employee combined charitable campaign takes place." Id. Some of plaintiffs' affiliated agencies were excluded from the Campaign under this requirement.

In 1994, the Legislature again amended Minn. Stat. § 309.501. First, it amended section (1)(b)(4) to establish an alternative to the 1993 requirement that a RCCO had to be governed by a local board of directors. The 1994 amendment provided that "if the charitable agencies are solely educational institutions which meet the requirements of paragraph (c), [a RCCO may be governed] by a national board of directors that has a local advisory board

---

[4]Minn. Stat. § 309.501(1)(c) defines an "affiliated agency" as "a charitable agency that is represented by a federation and has an ongoing relationship with that federation which involves a review and monitoring process to ensure financial, managerial, and programmatic responsibility." Minn. Stat. § 309.501(1)(c) (1994).

-4-

composed of members who live or work in the community or surrounding area." Act of Apr. 28, 1994, ch. 535, § 1, 1994 Minn. Laws 769, 770; Jt. App. B30, 31. Second, the Legislature added a provision to Minn. Stat. § 309.501(1)(b) stating that "[r]egistered combined charitable organization" includes a charitable organization organized by Minnesota state employees and their exclusive representatives for the purpose of providing grants to nonprofit agencies providing Minnesota residents with food or shelter if the charitable organization meets the requirements of clauses (1), (4), and (5)." Id.

The 1993 amendments had the practical effect of excluding from participation in the 1994-95 Campaign six organizations which had previously qualified as RCCOs, including the United Negro College Fund (UNCF), Open Your Heart to the Hungry and Homeless (OYH)[5], and plaintiffs. Under the 1994 amendments, UNCF and OYH became eligible once again to participate in the Campaign.

Plaintiffs, four federated charities who solicit contributions on behalf of a slate of individual member charities, are incorporated outside of Minnesota and solicit contributions in state and municipal public employee campaigns throughout the United States. Plaintiffs' applications to the 1994-95 Campaign were rejected due to non-compliance with the statutory eligibility requirements. On June 22, 1994, plaintiffs instituted the present action in the United States District Court for the District of Minnesota, challenging the constitutionality of the 1993 and 1994 amendments to Minn. Stat. § 309.501. The amended complaint alleged that the challenged amendments violate the First Amendment, federal equal protection and substantive due process, and the Commerce

---

[5]Open Your Heart to the Hungry and Homeless, a charitable organization created by Minnesota state employees, provides direct benefits to charities which give food and shelter to indigent Minnesota residents.

Clause. Plaintiffs sought a declaratory judgment and a permanent injunction against application of the 1993 and 1994 amendments. In addition, after filing their complaint, plaintiffs moved for a preliminary injunction allowing their participation in the 1994-95 Campaign pending final resolution of the present case. On July 29, 1994, the magistrate judge issued a Report and Recommendation that plaintiffs' motion for a preliminary injunction be denied. The district court, adopting the magistrate judge's Report and Recommendation, denied the preliminary injunction. On subsequent cross-motions for summary judgment, the district court granted summary judgment in favor of the State defendants. This timely appeal followed.

## II. Discussion

We review a grant of summary judgment de novo. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Insurance Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992). Where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

### A.    First Amendment Challenge

We begin by addressing plaintiffs' argument that the 1993 statutory amendments restricting the eligibility criteria for participation in the Campaign violate their First Amendment right to freedom of speech. The Supreme Court has recognized since

Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980) (Schaumburg), that charitable solicitations "are so intertwined with speech that they are entitled to the protections of the First Amendment." See id. at 632 (municipal ordinance prohibiting public solicitation of contributions by charitable organizations which did not use at least seventy-five percent of its receipts for "charitable purposes" was unconstitutionally overbroad under the First Amendment); see also Secretary of State v. Joseph H. Munson Co., 467 U.S. 947, 959 (1984) (Munson) (Maryland statute prohibiting charitable organizations, in connection with any fund raising activity, from paying expenses of more than twenty-five percent of the amount raised was unconstitutional limitation on protected First Amendment solicitation activity).

Schaumburg and Munson, however, involved regulations affecting door-to-door or on-street solicitation. In Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 797-99 (1985) (Cornelius), the Supreme Court recognized a constitutionally significant distinction between such public forms of charitable solicitation and the type involved in a fund raising drive conducted in the government workplace. See id. at 798-99. At issue in Cornelius was the exclusion of legal defense and political advocacy organizations from the Combined Federal Campaign (CFC), an annual charitable fund raising drive conducted in the federal workplace during working hours. See id. at 797-811. The government had limited participation in the CFC to health and welfare charities providing direct assistance to individuals, in contrast to nonprofit organizations engaged in lobbying or public interest litigation. After determining that the charitable solicitations in the CFC (consisting primarily of 30-word statements by participating charities) in a campaign pamphlet were protected speech, the Court concluded that the speech did not occur in either a traditional public forum or a limited public forum. Rather, it found that the CFC was a nonpublic forum, such that the

challenged regulations over access need only be "reasonable in light of the purpose served by the forum and . . . viewpoint neutral." See id. at 806. Applying the "reasonableness" test, the Court upheld the eligibility criteria excluding legal defense and political advocacy groups from the CFC, concluding that the restrictions were viewpoint-neutral and that the federal government might reasonably have concluded that the exclusion of legal defense and political advocacy groups from the CFC would increase federal employees' acceptance of the fund raising drive, limit disruption in the federal workplace, and avoid the appearance of government entanglement with particular viewpoints. See id. at 809 ("[T]he President could reasonably conclude that a dollar directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on litigation that might or might not result in aid to the needy."); see also Pilsen Neighbors Community Council v. Netsch, 960 F.2d 676, 686 (7th Cir. 1992) (Illinois statute requiring that charities seeking to participate in state employee deduction program obtain signatures of 4,000 employees and disclose on all petitions and payroll deduction cards the percentage of their receipts expended for fund raising and overhead costs was reasonable and did not violate First Amendment protections); United Black Community Fund, Inc. v. City of St. Louis, 800 F.2d 758, 760 (8th Cir. 1986) (city's decision to limit access to its payroll deduction program to charities whose administrative and fund raising costs did not exceed twenty-five percent of contributions was reasonable and viewpoint neutral under the Cornelius analysis).

In the present case, plaintiffs concede that the Campaign, like the CFC at issue in Cornelius, is a nonpublic forum. Yet they attempt to distinguish the holding of Cornelius on the basis that the restrictions on access to the CFC were in furtherance of an end -- the provision of food and shelter to the indigent -- that was not only reasonable but also laudable. By contrast, they argue, the 1993 amendments to Minn. Stat. § 309.501 "espouse no such worthy or even reasonable objective." Brief for Appellants at 6-7.

Thus, they contend that the 1993 amendments violate their First Amendment right to freedom of speech.

In response, the State defendants argue the district court correctly found that the challenged amendments satisfy the "reasonableness" test set forth in Cornelius for restrictions on access to a nonpublic forum.  The State defendants place great weight on the fact that the Supreme Court clarified in Cornelius that easing administrative manageability and reducing workplace disruption are legitimate justifications for restricting access to a nonpublic forum.  See Cornelius, 473 U.S. at 809-10.  The State defendants maintain that the amendments to Minn. Stat. § 309.501 satisfy the "reasonableness" standard, because they were enacted to  increase the manageability of the Campaign and to reduce disruption in the State workplace.  We agree.

Although the purpose of the 1993 amendments to Minn.  Stat. § 309.501 is not articulated in the statute itself, defendant Linda Barton, the state Commissioner of Employee Relations at the time the amendments were enacted, testified before the legislative appropriations conference committee that the goal of the  eligibility restrictions was to simplify the Campaign and make it operate more smoothly.  See Linda Barton Aff. ¶ 9, Jt. App. 68. Thus, to the extent that the 1993 amendments created a local nexus requirement, they were intended to make the Campaign more appropriate and relevant to the State and its employees.  Id.  The  State has  a  legitimate  interest  in  minimizing  workplace  disruption  and administrative difficulties related to the Campaign.  In our view, the 1993 amendments are reasonable because they are wholly consistent with these legitimate interests of the State.  See Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49 (1983) (preferential access to interschool mail system given to union representing teachers of the school district did not violate First Amendment).  The State defendants might reasonably have concluded that requiring RCCOs and their affiliated agencies to

-9-

demonstrate certain local connections would make the Campaign operate more efficiently by limiting the overall number of participating RCCOs and by restricting participation to those charities which provide a substantial benefit to Minnesota residents. In addition, the 1993 amendments are viewpoint-neutral, because there is no suggestion that the criteria for participation in the Campaign are intended to suppress one viewpoint or advance another.

Finally, we note that the Supreme Court in Cornelius made clear that a restriction on access to a nonpublic forum does not violate the First Amendment "merely because use of that forum may be the most efficient means of delivering the speaker's message." See Cornelius, 473 U.S. at 809. Even if the 1993 amendments preclude plaintiffs from participating in future Campaigns, they still retain ample alternative channels to solicit contributions from State employees -- such as direct mail and in-person solicitation outside the workplace -- because the amendments place no restrictions on plaintiffs' general ability to solicit donations in the State. Therefore, because the 1993 amendments are both viewpoint-neutral and reasonably related to a legitimate state interest, we hold that they do not violate plaintiffs' First Amendment right to freedom of speech.

**B.    Equal Protection and Due Process Challenge**

We now turn to plaintiffs' argument that the 1993 and 1994 amendments to Minn. Stat. § 309.501 violate their equal protection and substantive due process rights under the United States Constitution. Plaintiffs maintain that these amendments violate the Equal Protection Clause by creating a local/non-local distinction between charitable federations and affiliated agencies eligible for participation in the Campaign. Although plaintiffs concede that rational basis review should govern their equal

protection claim, they contend that neither the 1993 nor the 1994 amendments rationally promote a legitimate State objective. Similarly, they contend that the 1994 amendments run afoul of the Due Process Clause by creating alternatives to certain statutory eligibility criteria which have enabled UNCF and OYH to participate in the 1994-95 Campaign. In effect, plaintiffs argue that the State has violated the Due Process Clause by arbitrarily and capriciously granting UNCF and OYH preferential treatment.

Addressing plaintiffs' federal equal protection claim, the State defendants argue that the district court correctly found that the 1993 and 1994 amendments were rationally related to the State's legitimate objectives in minimizing workplace disruption and increasing the manageability of the Campaign. The State defendants also note that the State was not required to articulate its reasons for creating the current statutory scheme in order to withstand scrutiny under the rational basis test. Similarly, in response to plaintiffs' substantive due process claim, the State defendants maintain that the 1994 amendments were enacted to promote the State's legitimate goal of clarifying the purpose and goals of the Campaign and making it more manageable. Thus, they argue that the 1994 amendments fall well within the parameters of both federal equal protection and substantive due process. We agree.

Because the 1993 and 1994 amendments to Minn. Stat. § 309.501 do not target or exclude a suspect class, they will withstand scrutiny under the Equal Protection Clause so long as they are rationally related to a legitimate governmental objective. FCC v. Beach Communications, Inc., 113 S. Ct. 2096, 2101 (1993). Under rational basis review, challenged statutory classifications are accorded a strong presumption of validity, which is overcome only if the party challenging them negates "every conceivable basis which might support it." Id. at 2102. In the present case, plaintiffs have failed to make such a showing. As we concluded above, we think the Legislature might rationally have concluded

-11-

that restricting access to the Campaign to charities meeting the local connection requirements would not only decrease workplace disruption but would also render the Campaign more manageable and relevant to State employees. In sum, plaintiffs' rejected First Amendment claim fares no better when presented in equal protection garb. See Perry, 460 U.S. at 54-55 (upholding under rational basis review preferential access given by school district to exclusive bargaining representative of teachers in that district).

Also without merit is plaintiffs' claim that the 1994 amendments to Minn. Stat. § 309.501 violates the Due Process Clause. The Supreme Court made clear in Minnesota v. Clover Leaf Creamery Co., 449 U.S. 446, 470 n.12 (1981), that a statute which satisfies the rational basis test in an equal protection analysis also satisfies the rational basis test under substantive due process analysis. Because we have concluded that the 1994 amendments reasonably promote legitimate State objectives, we hold that the amendments comport with the requirements of the Due Process Clause.

C.    Commerce Clause Challenge

Finally, plaintiffs contend that the 1993 amendments to Minn. Stat. § 309.501 violate the dormant Commerce Clause by prohibiting out-of-state federations and non-local affiliated agencies from participating in the Campaign. The district court concluded that the 1993 amendments were exempt from scrutiny under the Commerce Clause because the State was acting as an employer rather than a regulator by defining the charitable organizations which would have access to its workplace for fund raising purposes. Slip op. at 25-26 (order from the bench). On appeal, plaintiffs contend that this determination was erroneous, because the State, by enacting the 1993 amendments to Minn. Stat. § 309.501, is regulating the charitable solicitation market. First, we must determine whether the State falls within the "market participant" exception to the

-12-

dormant Commerce Clause and, if it does not, we must consider whether the 1993 amendments impermissibly burden out-of-state charitable federations seeking to participate in the Campaign.

Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce. South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984) (Wunnicke); see also Wyoming v. Oklahoma, 502 U.S. 437, 454-59 (1992) (Oklahoma violated the Commerce Clause in requiring coal-fired electric utilities in the state to burn coal mixture containing at least ten percent Oklahoma-mined coal).  This "negative" or "dormant" aspect of the Commerce Clause prohibits economic protectionism - that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.  New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988).  It is well-settled, however, that the dormant Commerce Clause does not apply to states which are acting as "market participants," rather than as "market regulators."  See, e.g., White v. Massachusetts Council of Construction Employees, 460 U.S. 204, 214-15 (1983) (White) (City of Boston could require firms seeking eligibility for award of public construction contracts to have a work force made up of at least fifty percent of Boston residents); Reeves, Inc. v. Stake, 447 U.S. 429, 434-47 (1980) (Reeves) (South Dakota could constitutionally confine sale of cement produced at a state-owned plant solely to state residents during cement shortage because the State, as a seller of cement, was exempt from dormant Commerce Clause); Hughes v. Alexandria Scrap, 426 U.S. 794, 805 (1976) (Alexandria Scrap) (market participant exception applied to Maryland program to pay a bounty for every Maryland-titled junk car converted into scrap, despite imposition of more stringent documentation standards on out-of-state processors, because the program affected the market no differently than if Maryland were a private company bidding up the

price of auto scrap).  The rationale for the distinction drawn between States acting as market participants and those acting as market regulators is that the Commerce Clause primarily applies to state taxes and regulatory measures interfering with private trade in the national marketplace. Alexandria Scrap, 426 U.S. at 807-08.  By contrast, there is no indication that the Clause was intended to limit the ability of the States themselves to operate in the free market.  Reeves, 447 U.S. at 437.  In addition, as the Supreme Court explained in Reeves, because state proprietary activities are often burdened with the same restrictions imposed on private market participants, "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause."  Id. at 439.

In the present case, plaintiffs acknowledge that the State acts as an employer, and therefore participates in the labor market, by hiring employees.  Yet they maintain that the relevant market in this case is the charitable fund raising market, which exists independently of the labor market.  Plaintiffs argue that by  enacting the 1993 amendments to Minn. Stat. § 309.501, the State is regulating the charitable fund raising market and that the real participants in this market are state employees, acting as "buyers" of charitable services, and charitable federations, acting as "sellers" of such services.  Thus, plaintiffs attempt to distinguish the present case from White, Reeves, and Alexandria Scrap on the basis that the State is not acting as a buyer or seller in the charitable fund raising market.

The State defendants respond, first, that by implementing the 1993 amendments to Minn. Stat. § 309.501 the State is not acting as a market regulator but rather, as an employer, by limiting access to its workplace for the purpose of fund raising.  They contend that the State, like any private employer, has the right to select the parties with whom it will deal.  The State defendants rely on

Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 216 n.4 (1st Cir. 1994), for the proposition that the "market participant" exception applies not only when a State enters the market as a buyer or seller, but also when it acts as an employer to favor local citizens. Id. We agree with the position of the State defendants.

By excluding from the Campaign those charitable federations that could not meet the local connection requirements of the 1993 amendments, the State is acting as an employer restricting access to its workplace. Although the State is participating in the charitable fund raising market, it is doing so as a proprietor allowing its employees to make charitable contributions in the workplace. As such, the State may exercise discretion as to the charities permitted to solicit from state employees during working hours, in the same way that any private employer may limit the parties who conduct business with employees during the work day. Therefore, we reject plaintiffs' argument that the market participant exception does not apply to local and state governments acting as employers. We note that in White, 460 U.S. at 211 n.7, one factor influencing the Court's application of the market participant doctrine to the City of Boston's requirement that city residents comprise at least fifty percent of the work force of each firm awarded a public construction contract was the Court's observation that "[e]veryone affected by the order is, in a substantial if informal sense, 'working for the city.'" Id.

Moreover, the policies underlying the market participant exception also support its application to local and state governments acting as employers. As we explained above, this exception is founded on the notion that when a state enters the open market as a proprietor, rather than as a regulator, there is less danger that the state's activity will interfere with Congress's plenary power to regulate the market. See, e.g., Reeves, 447 U.S. at 437-39. We think this reasoning squarely envelops the situation where a State or local government acts as an

employer, and we see no well-founded reason to constrict the proprietary activities covered by the market participant exception to acts of buying or selling. Cf. Barton B. Clark, *Give 'Em Enough Rope: States, Subdivisions and the Market Participant Exception to the Dormant Commerce Clause*, 60 U. Chi. L. Rev. 615, 627 (1993) (contending that the fundamental principle of the market-participant doctrine should be whether a State is acting in a manner that "could legally be undertaken by a private party").

Our conclusion that the State is acting as a market participant, rather than as a market regulator, in implementing the 1993 amendments to Minn. Stat. § 309.501 is reinforced because the general regulation of charitable organizations is addressed elsewhere in Minn. Stat. Chs. 309 (Social and Charitable Organizations) and 317A (Nonprofit Corporations). By contrast, Minn. Stat. § 309.501 is directed solely towards defining the criteria that charitable federations must meet in order to qualify as RCCOs eligible to participate in the Campaign. Plaintiffs' arguments to the contrary are without merit.

Plaintiffs contend, however, that even if the State is held to be a participant in the charitable solicitation market, Commerce Clause scrutiny is still warranted, because the State is impermissibly regulating outside this market in the "downstream" market of charitable distribution. In other words, plaintiffs maintain that the present case most closely resembles Wunnicke, 467 U.S. at 96, in which the Supreme Court rejected Alaska's invocation of the market participant doctrine. In Wunnicke, Alaska had instituted a program of selling timber at a substantially reduced price from state-owned forests on the condition that buyers agree to process that timber at in-state facilities prior to export. See id. at 96-98. The Court held that "although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant." Id. at 98. It reasoned:

> In the commercial context, the seller usually has no say over, and no interest in, how the product is to be used after sale; in this case, however, payment for the timber does not end the obligations of the purchaser, for, despite the fact that the purchaser has taken delivery of the timber and has paid for it, he cannot do with it as he pleases. Instead, he is obligated to deal with a stranger to the contract after completion of the sale.

Id. at 96. Relying on Wunnicke, plaintiffs argue that the 1993 amendments to Minn. Stat. § 309.501 regulate "downstream," in the charitable distribution market, by requiring that each member charity supported by a RCCO "provid[e] all or substantially all of its health, welfare, social, or other human services, in the community and surrounding area in which the . . . [Campaign] takes place." Minn. Stat. § 309.501(1)(b)(8). We think plaintiffs' argument is misguided. Unlike the State of Alaska in Wunnicke, which acted as a seller of timber in the commercial market, the State of Minnesota in the present case is acting as an employer in the charitable fund raising market by restricting the charities that may solicit from state employees in the State workplace during business hours. In restricting charitable participation in the Campaign, the State has required that the member charities of each RCCO must provide all or substantially all of their services in the State. By establishing this requirement, the State is not performing a function separate from its role of an employer in restricting the charities which may solicit from State employees. Rather, in determining which charities may have access to its employees, the State is merely considering the regions where the charities will provide a substantial portion of their benefits. Thus, the present case is distinguishable from Wunnicke, in which Alaska, as a seller of timber, imposed requirements which were wholly unrelated to the purchase and sale of timber. See Wunnicke, 567 U.S. at 96-98.

Because we hold that the State is a market participant in the present case, the Commerce Clause presents no barrier to the 1993 amendments restricting the eligibility criteria for participation in the Campaign.[6] We therefore affirm the order of the district court concluding that the 1993 amendments to Minn. Stat. § 309.501 are exempt from scrutiny under the Commerce Clause.

### III. CONCLUSION

For the foregoing reasons, we hold that the exclusion of non-local fund raisers from the Campaign does not violate plaintiffs' First Amendment right to free speech or their rights to equal protection and due process. We further hold that the State is a "market participant"; thus the 1993 amendments to Minn. Stat.
§ 309.501 are exempt from scrutiny under the Commerce Clause.  Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]Thus, we need not consider the impact that the 1993 regulations have on out-of-state charitable federations and affiliated agencies seeking to participate in the Campaign.