**NATIONAL SOLID WASTE MANAGEMENT ASSOCIATION, Plaintiff,**

v.

**Charles W. WILLIAMS, in his official capacity as Commissioner of the Minnesota Pollution Control Agency, and Edward Garvey, in his official capacity as Director of the Minnesota Office of Environmental Assistance, Defendants.**

**Civil No. 4–96–388(DSD/JMM).**

United States District Court,
D. Minnesota,
Fourth Division.

June 19, 1997.

Timothy Robert Thornton, Jack Young Perry, Briggs & Morgan, Minneapolis, MN, for plaintiff.

Dwight & Wagneius, Beverly M. Conerton, Minnesota Attorney General, St. Paul, MN, for defendants.

## ORDER

DOTY, District Judge

This matter is before the court on plaintiff's and defendants' cross-motions for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motion, and denies plaintiff's motion.

## BACKGROUND

Plaintiff National Solid Waste Management Association ("NSWMA") is a trade association of companies engaged in providing waste management services. Many of NSWMA's members participate in the movement and disposal of waste in interstate commerce. Plaintiff asserts that its members have waste collection and disposal contracts with Minnesota public entities. Defendant Charles W. Williams is the Commissioner of the Minnesota Pollution Control Agency ("MPCA"), which is the state agency formed to meet "the variety and complexity of problems relating to water, air and land pollution in the areas of the state affected thereby, and to achieve a reasonable degree of purity of water, air and land resources of the state." Minn.Stat. § 116.01. Defendant Edward Garvey is the Director of the Minnesota Office of Environmental Assistance ("OEA"), which provides "technical and financial assistance for development, planning and implementa-

tion of state policies related to waste management." Affidavit of Arthur E. Dunn, Deputy Director of OEA; *see* Minn.Stat. §§ 115A.055–115A.12.

The Minnesota Legislature enacted the Waste Management Act in 1980, codified at Minnesota Statutes, Chapter 115A ("the Act"). The declared goals of the Act are "to protect the state's land, air, water, and other natural resources and the public health by improving waste management," and "to foster an integrated waste management system in a manner appropriate to. the characteristics of the waste stream.... " Minn.Stat. § 115A.02(a)(b). The "integrated waste management system" includes a hierarchy of preferences for the management of waste, in descending order of preferences being waste reduction and reuse, waste recycling, composting of yard waste and food waste, resource recovery through mixed municipal solid waste composting or incineration, and land disposal. Minn.Stat. § 115A.02(b)(1)–(5). The Act requires counties to establish and implement plans addressing the state policies and purposes which are not inconsistent with state law. Minn.Stat. § 115A.46; *see Ben Oehrleins v. Hennepin County*, 115 F.3d 1372 (8th Cir.1997). In preparing the plans, political subdivisions are required to consult with persons providing solid waste collection, processing, and disposal services. Minn.Stat. § 115A.46, subd. 1(d). The plans must be initially approved and then updated and resubmitted for approval every five years. Minn.Stat. § 115A.46, subd. 1(e), (f).

The Act also speaks directly to public entities. Minn.Stat. § 115A.46, subd. 5 (describing the "Jurisdiction of Plan"); Minn.Stat. § 115A.471 (describing "Public entities; management of solid waste"). The Act provides for the jurisdiction of a county plan:

(a) After a county plan has been submitted for approval ..., a public entity ... within the county may not enter into a binding agreement governing a solid waste management activity that is inconsistent with the county plan without the consent of the county.

(b) After a county plan as been approved ... the plan governs all solid waste

management in the county and a public entity ... within the county may not develop or implement a solid waste management activity, other than an activity to reduce waste generation or reuse waste materials, that is inconsistent with the county plan that the county is actively implementing without the consent of the county.

Minn.Stat. § 115A.46, subd. 5. A "public entity" is defined as "the state, an office, agency, or institution of the state, the metropolitan council, a metropolitan agency, the metropolitan mosquito control district, the legislature, the courts, a county, a statutory or home rule charter city, a town, a school district, another special taxing district, or any contractor acting pursuant to a contract with a public entity." Minn.Stat. § 16B.122, subd. 1(f).

In addition, if the public entity enters into or approves a contract for the management of mixed municipal solid waste which would manage the waste using a waste management practice that is ranked lower on the list of preferred waste management practices than the waste management practice selected in the county plan for the county in which the waste was generated, the public entity must: "(1) determine the potential liability to the public entity and its taxpayers for managing the waste in this manner; (2) develop and implement a plan for managing the potential liability; and (3) submit the information from clauses (1) and (2) to the agency." Minn. Stat. § 115A.471. "Public entity" under section 115A.471 is defined more narrowly than under section 115A.26. Under section 115A.471, "public entity" means "the state; an office, agency, or institution of the state; the metropolitan council; a metropolitan agency; the metropolitan mosquito control district; the legislature; the courts; a county; a statutory or home rule charter city; a town; a school district; another special taxing district; or any other general or special purpose unit of government in the state." Thus, the requirements of section 115A.471 do not apply to contractors.

Plaintiff challenges sections 115A.46, subdivision 5, and 115A.471 as in violation of the Commerce Clause. Plaintiff asserts that the statutes restrict the flow of interstate commerce and bar the importation of waste processing services. Plaintiff argues that the statutes are *per se* "economic protectionist" measures aimed at isolating in-state processing facilities from the state and national solid waste market, specifically the out-of-state landfills. Plaintiff urges that the statutes are subject to strict scrutiny and that no health, safety or welfare purpose exists for mandating that all Minnesota generated waste from counties with designated waste processing facilities and under contract with a public entity be disposed of at these processing facilities. Plaintiff claims that the sole purpose of the statutes is to favor local processing facilities against all out-of-state landfills. In addition, plaintiff claims that there are several less discriminatory alternatives to sections 115A.46, subdivision 5, and 115A.471, such as imposition of general taxes or institution of a competitive disposal price. Plaintiff's Complaint at ¶¶ 47–56.

The plaintiff's challenge is not the first attack on provisions or implementations of the Act. *See Ben Oehrleins v. Hennepin County,* 115 F.3d 1372 (8th Cir.1997) (affirming finding that enactment pursuant to §§ 115A.80–.893 was in violation of the Commerce Clause); *Waste Systems Corp. v. County of Martin, Minn.,* 985 F.2d 1381, 1388–89 (8th Cir.1993) (affirming finding of violation of the Constitution); *National Solid Waste Management Ass'n v. Williams,* 877 F.Supp. 1367, 1379–80 (D.Minn.1995) (finding § 115A.47 violative of the Commerce Clause); *see also C & A Carbone, Inc. v. Town of Clarkstown, NY,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (determining that a flow control ordinance violated the Commerce Clause). Plaintiff claims that the discriminatory effect of the statutes at issue in this case is merely a resurrection of designation with a more limited scope; in other words, only the public entity is affected. Thus, plaintiff argues that the out-of-state landfill market is "absolutely excluded from competing for the public entity waste stream." Plaintiff's Memorandum in Support of Motion at 23.

The defendants argue that the statutory provisions challenged in this case do not regulate the conduct of private persons involved

848

in the waste market and, thus, are unlike the statutes or ordinances at issue in prior cases. The defendants summarize section 115A.46, subdivision 5, by stating that "when a public entity takes on a solid waste management activity, such as garbage collection and disposal or recycling or yard waste management, either using government workers and equipment or hiring contractors to act on behalf of the government, it must do so in a manner that is consistent with certain conditions ... [which] are set out in a county's solid waste management plan." Defendant's Memorandum in Support of Summary Judgment at 4. Defendants also argue that section 115A.471 "does not obligate any entity, private or public, to undertake or refrain from undertaking any waste management practice. Rather, it merely requires public entities to assess and plan for their potential liability if they decide to undertake certain waste management activities." Defendant's Memorandum in Support of Motion at 4.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material if its resolution affects the outcome of the case. There is a genuine of issue of fact if the evidence is such that it could be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment is granted for the moving party if, under the governing law, there can be but one reasonable conclusion as to a jury's verdict. *Id.*

On a motion for summary judgment, all evidence and inferences are viewed in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Nevertheless, the nonmoving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted for the defendant because a failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court addresses defendant's motion for summary judgment.

### B. The Commerce Clause

The Commerce Clause of the Constitution of the United States provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States ...." U.S. Const. art. I, § 8, cl. 3. Although the language provides an affirmative grant of power to Congress, the Clause is also recognized as "a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Independent Charities of America v. State of Minn.*, 82 F.3d 791, 798 (8th Cir.) (citing *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984)), *cert. denied,* —— U.S. ——, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996). The "negative" or "dormant" aspect is understood to deny "the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Oregon*, 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994); *see National Solid Waste Management Ass'n*, 877 F.Supp. at 1373 (quoting *Oregon Waste Sys.*). In essence, the dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). However, the courts have drawn a distinction between state regulation of a market and state participation in a market, thereby recognizing that the Commerce Clause does not apply to a market participant. *See Chance Management, Inc.*

*v. State of S.D.,* 97 F.3d 1107, 1110 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 217 (1997); *see also Wunnicke,* 467 U.S. at 93–95, 104 S.Ct. at 2243–44; *White v. Massachusetts Council of Const. Employers, Inc.,* 460 U.S. 204, 208, 103 S.Ct. 1042, 1044–45, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 808–10, 96 S.Ct. 2488, 2497–98, 49 L.Ed.2d 220 (1976) ("Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others."). "A state acting as a market participant is free from the strictures of the Commerce Clause because there is no indication that the [Commerce] Clause was intended to limit the ability of the [s]tates themselves to operate in the free market.'" *Chance Management,* 97 F.3d at 1111 (quoting *Charities,* 82 F.3d at 799). The court's inquiry in the market participation cases is whether the state is participating in a narrowly defined market as a proprietor rather than simply regulating the actions of other private market participants. *See Id.* "To the extent that a state is acting as a market participant, it may pick and choose its business partners, its terms of doing business, and its business goals—just as if it were a private party." *SSC Corp. v. Town of Smithtown,* 66 F.3d 502, 511 (2nd Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996)

### 1. Section 115A.46, subdivision 5

 In this case, defendants assert that section 115A.46, subdivision 5, requiring public entities to comply with county plans, is a self-limiting rather than market-regulating statute. Defendants assert that the statute merely establishes conditions when a public entity, on its own or through contractors, collects or disposes of garbage. Defendants argue that when a public entity collects or manages waste using government workers and equipment, it is performing activities that a private party could perform; in other words, the government is acting in a proprietary function. The defendants assert that in doing so, the public entity may act as an employer contracting for services. Defendants argue that this case is distinguishable from previous cases because, whereas designation applied to all entities, public and private, and to all solid waste, residential and business, section 115A.46, subdivision 5 only applies to public entities that manage waste and then only to the waste that the public entity chooses to manage.

NSWMA argues that the statute is a "state-mandated local preference" statute which should not be subject to the market participant exception. In support of its position, NSWMA relies on a Seventh Circuit Court of Appeals decision authored by Judge Posner. *See W.C.M. Window Co. v. Bernardi,* 730 F.2d 486 (7th Cir.1984). In *Bernardi,* the plaintiff challenged an Illinois state statute which required any public works project or improvement for the State of Illinois or any political subdivision, municipal corporation or other governmental unit, to employ only Illinois laborers on such project or improvement, unless laborers were not available or not capable of performing the particular type of work involved. A public school board hired an Illinois corporation to replace some windows; the Illinois corporation then subcontracted the work to an unincorporated association of Missouri residents, in contravention of the local preference statute. The court determined that the State of Illinois was a regulator and the public entity, the local school board, was the market participant. The market participant exception did not apply to the Illinois preference law. In making this determination, the Seventh Circuit recognized that the window-replacement project was not financed or administered by the state. Instead, "[t]he state [wa]s a regulator, telling thousands of local government units that they must not give construction contracts to employers of nonresidents." *Id.* at 495. In finding that the market participant exception did not apply, Judge Posner reasoned:

The difference between the state's preferring state residents in its own dealings and forcing local agencies to do so in theirs is both analytical and quantitative. When the project on which the state impresses a

homestate preference is undertaken by a unit of local government without any state financial support or supervision, the state is not a participant in the project but a regulator. And since more public contracting in the states is done at the local level, by cities, school districts, park districts, counties, etc., than at the state level, extending [the market participant exception] to cases where the state's relationship to its local agencies is purely regulatory could do great damage to the principles of free trade on which the negative commerce clause is based.

*Id.* at 496. Based on that analysis, plaintiff asserts that the Minnesota statute is regulating public entities rather than acting as a market participant; therefore, NSWMA argues, the market participant exception does not apply.

Defendants assert that for market participation purposes, plaintiff's distinction between the state and subdivisions is inconsequential. The parties recognize that there is a division among the circuit courts with respect to this issue and that the Eighth Circuit Court of Appeals has not spoken. Defendants urge the court to adopt the analysis of the Third and Ninth Circuits which differ in opinion from the Seventh Circuit. In *Trojan Technologies, Inc. v. Commonwealth of Pa.*, 916 F.2d 903, 911 (3d Cir.1990), *certiorari denied*, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), the Third Circuit disagreed with the *Bernardi* court and found no analytical difference between a local government unit and central state agencies. The *Trojan* court reasoned that both exist through the affirmative acts of the state, and that a municipality derives its authority from the state. *Id.* at 911. Because under Pennsylvania law it was clear that the local bodies existed only by state authority and with such powers as the state affirmatively provided, the court saw "no reason why, attendant on making such affirmative grants of power, the Commonwealth may not also restrict the contracting authority of such local bodies." *Id.* Furthermore, because "imposing such restrictions on central state agencies certainly would be permitted," the court did not "believe restrictions on local bodies stand in any different light." *Id.*

In *Big Country Foods, Inc. v. Board of Education of Anchorage Sch. Dist.*, 952 F.2d 1173, 1178–79 (9th Cir.1992), the court addressed the issue of whether the market participant exception could apply to a state statute requiring its political subdivisions to favor state residents in the procurement or sale of goods. The Ninth Circuit likewise disagreed with *Bernardi* and followed the *Trojan* court's rationale that political subdivisions generally exist at the will of the state. The *Big Country* court explained:

A state should not be penalized for exercising its power through smaller, localized units; local control fosters both administrative efficiency and democratic governance.

A rule that would consider all political subdivisions as separate from state control for market participant purposes would be anomalous to the proposition that political subdivisions exist at the will of the state. A rule that would consider some political subdivisions as separate from the state controls would lead to difficult case-specific inquiries into the degree of subdivision autonomy.

*Id.* at 1179; *see also Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1319 (4th Cir.1994) (agreeing with the Third and Ninth Circuits that the distinction drawn by the Seventh Circuit "simply does not make sense in this constitutional matter"). The Ninth Circuit concluded that the State of Alaska did not impose an impermissible downstream requirement by forcing school districts to enter into contracts on terms set by state requirements, and applied the market participant exception.

Although the Eighth Circuit Court of Appeals has not addressed this issue, this court is guided by the analysis of the Third and Ninth Circuits. This court determines that the application of the market participant exception is not thwarted by the fact that section 153A.46, subdivision 5, places requirements on public entities when they partake in solid waste management activity. In this instance, the statute does not require the public entity to collect or dispose of waste,

but when it chooses to do so, it must comply with the county's plan. This court is persuaded by defendants' argument that the state agencies and political subdivisions derive their authority from the state. *See e.g.*, Minn. Const. art. 12, § 3 (providing that the legislature may provide for the creation, organization, administration, consolidation, division and dissolution of local government units and their functions). The logical extension of that relationship between the state and subdivisions, as discussed in *Trojan* and *Big Country*, includes the ability of the state to set parameters for its governmental units as market participants. This court concludes that the fact the conditions in this case are contained in a state statute enacted at the state level as opposed to an ordinance *or* directive adopted by the local public entity is of no consequence with respect to the application of the market participant exception.

NWSMA challenges this interpretation, however, claiming that the statute goes too far in that the statute specifically refers to "contractors" and affects the conduct of private parties in the market, in contravention of the dormant Commerce Clause. Defendants argue that section 115A.46 is only being applied to contractors through contract provisions or by amendments to existing contracts which the contractor has with the public entity. The Supreme Court addressed similar issues in *White v. Massachusetts Council of Construction Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) and in *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). "In both cases, the government reached beyond 'the boundary of formal privity of contract' to influence the economic relationships between its trading partners and other parties." *See SSC*, 66 F.3d at 514 (quoting *White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7). In *White*, the Supreme Court upheld an executive order in the City of Boston which required that all construction projects funded by the city were to be performed by a work force consisting of at least fifty percent Boston residents. *White*, 460 U.S. at 206, 103 S.Ct. at 1043–44. In effect, the contractors hired by the city were required to hire half of their workers from Boston. The Supreme Court recog-

nized that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," but found it unnecessary to define the limits with precision and stated that:

> [T]he Commerce Clause does not require the city to stop at the boundary of formal privity of contract. In this case, the Mayor's executive order covers a discrete, identifiable class of economic activity in which the city is a major participant. Everyone affected by the order is, in a substantial if informal sense, "working for the city."

*White*, 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7.

In contrast, in *Wunnicke*, the court examined an Alaskan program which provided for the sale of timber from state-owned forests at reduced prices but which also required at least partial processing of the timber in Alaska prior to it being shipped out of the state. *Id.* at 84–85, 104 S.Ct. at 2238–39. The Supreme Court held that the market participant exception did not apply and recognized that "although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant." *Id.* at 98, 104 S.Ct. at 2246. Thus, this court must determine whether section 153A.46, subdivision 5, is more akin to the executive order in *White* which was subject to the market participant exception, or to the program in *Wunnicke* which was not.

In urging this court to apply the market participant exception, defendants assert that this case is similar to *SSC Corp. v. Town of Smithtown*, 66 F.3d 502 (2nd Cir.1995), *certiorari denied*, —— U.S.——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996). In *SSC*, the City of Smithtown, New York, passed a "flow control" ordinance which required all residential and commercial garbage to be disposed of at an incinerator. *Id.* at 505. Smithtown also created a residential garbage collection district and entered into a contract with private garbage haulers to pick up all household garbage in the district. *Id.* Under the contractual provisions, the haulers were required to take the garbage to the incinerator.

*Id.* The *SSC* court invalidated the ordinance, but stated that the central question in determining whether the contract constituted market participation was whether it more closely resembled Boston's local-processing requirements in *White* or Alaska's local-processing requirements in *South–Central Timber.* The Second Circuit determined that Smithtown was a participant in waste collection and waste disposal, and that the town was spending tax dollars to pay for the services, just as Boston was spending tax dollars to pay the salaries of its contractors' construction workers in *White.* 66 F.3d at 515. The Second Circuit explained:

> If Boston could require contractors for city-funded projects to hire a certain percentage of city residents, then Smithtown can require SSC to hire town residents to drive its garbage trucks—since those truck drivers would be "in a substantial if informal sense 'working for the city.'" [*White,* 460 U.S.] at 211 n. 7, 103 *S.* Ct. at 1046 n. 7. And if Smithtown can require SSC to hire local truck drivers, then it can require the hauler to use local incinerating services as well. It makes no difference in our estimation whether those services are provided by a private company ..., or by a public entity like Smithtown. Because the waste disposal services are "substantial[ly] if informal[ly]" being provided to Smithtown, the town can decide with whom it will deal.

*SSC,* 66 F.3d at 515.

This court concludes that the statute at issue in this case, which requires contractors hired by the public entities to comply with the county's solid waste management plan, is analogous to the contract requirements placed on the contractors in *SSC.* The court agrees that the State, through its subdivisions, acts as a market participant in the collection and management of waste (if the public entity so chooses), and thus may dictate the terms for the collection and management of solid waste, since the contractors are in essence working for the public entity. Although the definition of "public entity" includes "contractors," the statute only applies to contractors who have a contract with a public entity. The inclusion of "contractors"

in the definition of "public entity" does not transform the state and its subdivisions from market participants to market regulators, it simply clarifies the role of the contractors when they, as opposed to the public entity itself, collect and dispose of waste on behalf of the public entity. Because the market participant exception applies, the court does not reach the issue of whether the statute has a discriminatory effect on commerce.

**2. Section 115A.471**

■ Plaintiff also challenges section 115A.471, which requires a public entity to do certain things if it chooses to manage waste using a waste management practice that is ranked lower on the list of preferred waste management practices than the waste management practice selected in the county plan. If a public entity decides to deviate from the county's plan by choosing a lesser preferred practice, the public entity must determine its potential liability, develop and implement a plan for managing the potential liability, and submit the information to the agency. *See* Minn.Stat. § 115A.471. Defendants argue that NSWMA does not have standing to challenge section 115A.471.

■ This court's jurisdiction is limited by Article III of the U.S. Constitution, which limits the judicial power of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. A threshold question in every case is whether the plaintiff has standing to invoke the jurisdiction of the federal courts. The standing doctrine is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 561, 112 S.Ct. 2130, 2136, 2136–37, 119 L.Ed.2d 351 (1992); *Mausolf v. Babbitt,* 85 F.3d 1295, 1301 (8th Cir.1996) (recognizing that standing requirement is indispensable part of case). To establish standing within the constitutional core requirements of Article III, a plaintiff must satisfy three elements: (1) that plaintiff suffered an injury in fact; (2) that there is a causal connection between plaintiff's injuries and the challenged action; and (3) that a favorable decision in the case would likely redress plaintiff's injuries. *Lujan,* 504 U.S. at 560, 112

S.Ct. at 2136; *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975) (placing burden of establishing standing on the party seeking federal jurisdiction). In addition to the constitutional standing requirements, courts have imposed prudential limits on the exercise of jurisdiction. *See Ben Oehrleins*, 115 F.3d at 1379 (concluding that plaintiffs did not have standing based on prudential considerations to assert claims).

The defendants challenge plaintiff's standing in the context of a summary judgment motion. In *Lujan*, the Supreme Court reiterated the magnitude of a plaintiff's burden depending upon the stage in the proceedings:

> The party invoking federal jurisdiction bears the burden of establishing [the standing elements]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. R. Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37 (internal case citations and quotations omitted).

■ The court will first address the constitutional minimal required by Article III. The injury-in-fact element requires more than a cognizable interest; rather, NSWMA must sufficiently allege that its members are directly affected by the statute. *See Sierra Club, North Star Chapter v. Browner*, 843 F.Supp. 1304, 1309 (D.Minn.1993) (citing *Lu-*

jan *v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). As discussed, the Minnesota Legislature did not similarly define "public entity" under section 153A.471 and section 115A.26, subdivision 5. "Public entity" under section 153.471 does not include a "contractor acting pursuant to a contract with a public entity." Compare Minn.Stat. § 115A.26, subd. 5 (defining "public entity" pursuant to section 16B.122, which includes contractors acting pursuant to contracts with a public entity), *with* Minn.Stat. § 153A.471 (defining "public entity" without the inclusion of contractors). Plaintiff is not a "public entity" as defined under section 115A.471 and does not contend that it is raising its arguments on behalf of a public entity. In short, section 115A.471 does not impose any requirements or burdens on the plaintiff which could be perceived as an injury in fact under the constitutional standing requirements.

This determination is underscored by the plaintiff's submissions to the court. A member of the association submitted an affidavit on behalf of plaintiff stating that "the costs of complying with these statutory requirements would be prohibitively expensive. Such liability determination and management would cost tens of thousands of dollars. This cost would in most, if not all, cases dwarf the size of [our] public entity[ ] waste disposal contracts." Affidavit of Sandra Lee Roskowiak, Vice President of Randy's Sanitation, at ¶ 2. Plaintiff did not substantiate its cost predictions or show an injury in fact. Even as to the speculated injury, there is no evidence that such losses are due to the requirements placed on public entities under section 115A.471.

In this instance, the court determines that NSWMA has failed to come forth with sufficient evidence of an injury in fact to satisfy the constitutional minimal for standing to challenge section 115A.471. Because plaintiff lacks standing under Article III's requirements, the court need not address the prudential limitations on standing.

## CONCLUSION

■ Based on the foregoing, **IT IS HEREBY ORDERED** that defendants' mo-

tion for summary judgment is granted; and plaintiff's motion for summary judgment is denied. Plaintiff's action is dismissed with prejudice.[1]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**1.** The court recognizes that the parties did not move for summary judgment on count II of plaintiff's complaint which asserts a violation of section 1983 of Title 42, a statute creating no substantive rights, but providing a remedy when rights secured by federal law or the Constitution are deprived under color of state law. *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 2746–47, 73 L.Ed.2d 482 (1982). An underlying constitutional right must exist before a cause of action under section 1983 will lie. Plaintiff must show that defendants violated a right, privilege or immunity protected by the Constitution or laws of the United States. Because the court has determined that no violation of the Commerce Clause exists and because that is the only other claim asserted in the complaint, the court also dismisses plaintiff's section 1983 claim.