# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2979

_____

Red River Service Corp.,

                Appellant,

        v.

City of Minot, North Dakota,

                Appellee.

\*
\*
\*
\*
\*    Appeal from the United States
\*    District Court for the
\*    District of North Dakota.
\*
\*
\*

_____

Submitted: March 9, 1998
Filed: June 10, 1998

_____

Before WOLLMAN and LOKEN, Circuit Judges, and BATAILLON,[1] District Judge.

_____

BATAILLON, District Judge.

      When the City of Minot, North Dakota refused to allow Red River Service Corporation (Red River), an Oklahoma waste transport business, to dispose of solid waste from the Minot Air Force Base (MAFB) in the city's landfill, Red River filed suit

_____

[1] The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, sitting by designation.

against the city in the District Court for the District of North Dakota seeking damages, injunctive relief, and attorney's fees. In its complaint, Red River alleged that the city's refusal to allow Red River access to the landfill violated the Commerce Clause, U.S. Const. art. I, § 8, cl. 3; violated the Equal Protection Clause, U.S. Const. amend. XI; violated 42 U.S.C. § 1983; and breached an oral contract.

I.

Red River appeals from the district court's denial of its motion for partial summary judgment and the granting of the City of Minot's motion for summary judgment.

The district court held that Minot was not subject to the constraints of the Commerce Clause because it operated the landfill just as any private operator would. Hence, the city was a "market participant" rather than a "market regulator" and, as such, it had the right to sell space in the landfill to whomever it chose.

On Red River's equal protection claim, the district court noted that Red River never asserted membership in a suspect class nor claimed that Minot was violating its fundamental rights. Minot's denial of access was, therefore, subject only to rational basis scrutiny. The court held that preserving space in the landfill for citizens of Minot was a rational reason for the city to deny Red River access.

The district court also ruled that any oral contract between Red River and Minot was barred by the North Dakota statute of frauds requiring that contracts that cannot be performed in a year must evidenced by a writing. Since the alleged oral contract was apparently co-terminous with Red River's five-year contract with MAFB, the court held that it could not have been performed within a year.

Finally, the district court noted that while the doctrine of estoppel could be applied against the government under North Dakota case law, it was to be applied only after a careful weighing of the equities involved. The district court declined to apply the doctrine in this case because Red River had failed to obtain solid assurances from Minot that it could use the city's landfill before it bid the five-year contract with MAFB.

We review a grant of summary judgment de novo, applying the same standards as the district court. *See Rabushka ex rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied,* 118 S. Ct. 1336 (1998). Summary judgment is appropriately granted if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *State Farm Mut. Auto. Ins. Co. v. Shahan,* 1998 WL145925 (8th Cir. 1998).

Red River contends that the district court erred: 1) in finding that Minot is a market participant" rather than a "market regulator"; 2) in finding that Minot did not violate Red River's equal protection rights under the United States Constitution by allowing other waste transport businesses from outside of the city to use the landfill; 3) in finding that Minot breached an oral contract with Red River which allowed Red River access to the landfill; and 4) in failing to apply the doctrine of estoppel with respect to the Red River's contract claim.

We affirm.

II.

The City of Minot owns and operates a municipal landfill. Beginning in 1993, Minot began to grapple with serious policy considerations involving the landfill. J.A. at 162. Both the Public Works and Safety Committee of the Minot City Council and the

Yard Waste Ad Hoc Committee debated over the course of several years what types of waste and how much should be allowed into the landfill, which waste haulers should be allowed to dump into the landfill, and what charges should be imposed on those using the landfill. By early 1994, both groups had questioned whether Minot could continue to take waste from outside the city. J.A. at 87, 96, 113, 114. Much of the debate concerned disposal of municipal (also called domestic or household) solid waste, putrescible matter such as the remnants of meals, and yard waste, grass clippings and other organic materials collected from domestic residences. Municipal solid waste is expensive to handle since, unlike inert waste, it requires leachate collection systems and ground water monitoring.[2] *See* Minot Code § 14-1, "Inert waste."

To extend the useful life of its landfill, the city council formally decided in late 1996 that it would accept only municipal solid waste generated by its own citizens and by certain non-citizen haulers who were grandfathered in under the new arrangement.[3] As a result of this evolving policy, the city council further decided that it would not accept in its landfill the estimated 5,000 tons a year of municipal solid waste that Red River collected from MAFB even though it had "ample room" for the waste. J.A. at 129, 142, 155. Minot allowed Red River and other haulers to dump inert waste -- construction debris -- from MAFB and elsewhere in the landfill. Aff. of Alan M. Walter, J.A. at 193. The volume of inert waste brought to the landfill is "minuscule"

---

[2]Examples of inert waste include construction and demolition material such as metal, wood, bricks, masonry and cement concrete, tires, tree branches, bottom ash from coal fire boilers and waste coal fines from air pollution control equipment. Minot Code § 14-1, "Inert waste."

[3]While the city council did agree in April 1997 to accept for six months waste from the Grand Forks, North Dakota area following the disastrous spring floods of that year, this agreement resulted from an emergency request from the North Dakota State Health Department. J.A. at 158. As the appellee notes, however, no waste from the Grand Forks area was ever deposited in the Minot landfill. Appellee's Br. at 16.

compared to the volume of municipal solid waste that might find its way to the landfill were open dumping allowed. Appellant's Br. at 17.

At the time the city council decided not to accept Red River's solid waste from MAFB, however, Red River already had bid a five-year contract to haul MAFB's solid waste, apparently based on the belief that Minot would accept the waste. J.A. at 143. Red River claims that it bid the MAFB contract only after it received quotes from the city on usage rates and written assurances from the city's director of public works that Red River could use the landfill. J.A. at 131.

III.

Red River argues that Minot's decision not to accept the solid waste from MAFB in its municipal landfill violates the Commerce Clause because Minot is a market regulator rather than a market participant. We disagree.

The Commerce Clause grants Congress the power to regulate commerce among the states. It primarily has been applied to state taxes and regulatory measures that restrict free trade by imposing burdens on out-of-state economic interests. *Reeves, Inc. v. Stake,* 447 U.S. 429, 440 (1980). This limitation on state power, frequently called the "dormant" Commerce Clause, "prohibits economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. v. Limbach,* 486 U.S. 269, 273 (1988).

When a state or local government acts as a market participant rather than a market regulator, however, its conduct is outside the reach of the Commerce Clause. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 809-810 (1976) (applying doctrine to Maryland program paying a bounty for scrapping junk cars titled in Maryland, even though out-of-state processors faced stricter documentation requirements, since Maryland was similar to a private company bidding up the price of scrap); *Reeves,* 447

U.S. at 440 (applying doctrine when, during a national shortage, South Dakota sold cement from a state-owned plant only to its residents); *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 207 (1983) (allowing Boston to require firms seeking public construction contracts to have a workforce of at least fifty percent Boston residents); *South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 93 (1984) (plurality) (blocking Alaska from requiring that timber taken from state lands be processed within the state before export since the requirement attempted to control the market after sale of the timber). If a state or local government is a market participant in a business, it may pursue its own economic interests free from the constraints imposed by the Commerce Clause within the market in which it is a participant. *Wunnicke,* 467 U.S. at 97. This freedom includes the right to choose its own trading partners without regard to whether its choices discriminate against out-of-state businesses, *id.* at 99, or favor its own citizens, *Alexandria Scrap,* 426 U.S. at 810. In short, the Commerce Clause does not "limit the ability of the States themselves to operate freely in the free market." *Reeves,* 447 U.S. at 437.

While the Supreme Court has not recently revisited the doctrine in a waste context, several lower courts have embraced it when state or local governments have engaged in proprietary activities involving waste that "burden" private economic interests.[4] For example, in a closely analogous case, the United States Court of Appeals for the Third Circuit held that a county acted as a market participant rather than a

---

[4]This circuit has applied the doctrine several times in recent years, but not in a waste context. *See, e.g., Four T's Inc. v. Little Rock Mun. Airport Comm'n,* 108 F.3d 909 (8th Cir. 1997) (commission was a market participant when it provides concession areas and assesses concession fees); *Independent Charities of America, Inc. v. Minnesota,* 82 F.3d 791 (8th Cir. 1996) (state acted as an employer in the charitable fund raising market by restricting the charities that may solicit from state employees in the state workplace during business hours); and *Chance Mgt., Inc. v. South Dakota,* 97 F.3d 1107 (8th Cir. 1996) (state acted within the gaming market to impose a residency requirement on all applicants for operators' licenses for video lottery machines).

market regulator when, in an effort to preserve space in its landfill for local residents, it decided to charge a higher rate to receive and dispose of waste generated outside the county and five nearby counties and to limit the daily amounts that an out-of-state waste processor could dump. The volume limitations caused the out-of-state processor economic hardship because it was forced to send its waste to more distant (and hence more costly) disposal sites. The court found that the county was a market participant in the disposal services market. The price and volume conditions that the county imposed governed only the landfill operated by the county and applied only to the narrow, immediate market of the county and its neighbors. *Swin Resource Sys., Inc. v. Lycoming County,* 883 F.2d 245, 250 (3d Cir. 1989).

In another illustrative case, private waste disposal companies brought suit under the Commerce Clause against three cities that had enacted ordinances restricting the collection and disposal of solid waste in a four-county region. Each city was a participating member of the public, non-profit Southeast Alabama Solid Waste Authority. One ordinance required that all solid waste generated within the city must be disposed of at the Authority's facility. The second ordinance was similar to the first but it also vested in the city title to all solid waste generated within the city and prohibited private contracts between waste collectors and waste generators. The third ordinance was also similar to the first but it permitted waste collectors and haulers the option of taking waste out-of-state so long as they complied with reporting requirements not imposed if waste was deposited in the Authority's facility. The district court found that none of the cities could claim the market participant exception  since the cities were "not purchasers as was Maryland in *Alexandria Scrap,* or sellers as was South Dakota in *Reeves, Inc. v. Stake,* or bona fide interest holders in construction projects as was Boston in *White v. Massachusetts Council." Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Authority,* 814 F. Supp. 1566, 1572 (M.D. Ala. 1993). The court said that the intent behind the ordinances and the cities' contracts with the Authority was "not individual market participation but broad market regulation. . . . [T]he ordinances impermissibly regulate outside the market in which the

cities are actual participants." *Id.* at 1573. *See National Solid Waste Mgt. Ass'n v. Williams,* 966 F. Supp. 844 (D. Minn. 1997) (holding state acted as market participant in the collection and management of waste even though contractors hired by public entities had to comply with the county's solid waste management plan); *Barker Bros. Waste, Inc. v. Dyer County Legislative Body,* 923 F. Supp. 1042 (W.D. Tenn. 1996) (holding county was market participant in the trash hauling market, even though it contracted out garbage collection services in an exclusive contract with a private hauler).

Here, Minot has chosen, in an effort to prolong the useful life of its landfill, to limit those who can dispose of municipal solid waste in its landfill. Significantly, Minot has not attempted to regulate the flow of waste beyond its own market nor to require that all waste generated in the Minot market be deposited in the Minot landfill. Red River obviously will suffer serious economic consequences as a result of the city's decision because it will be forced to haul the municipal solid waste from MAFB to more distant landfills, thus increasing its costs. Minot is not obligated, however, to vouchsafe Red River's economic health. As a market participant, it has the freedom to choose its trading partners without regard to Red River's contractual obligations to MAFB.

Red River states that the district court "misconstrued the law" in applying the market participant doctrine to Minot's actions. Appellant's Brief at 26. To establish that Minot is instead a market regulator, Red River advances several unpersuasive theories.

First, citing *Camps Newfound/Owatonna, Inc. v. Harrison,* 117 S. Ct. 1590 (1997), Red River asserts that because public funds established and now support the landfill, the city cannot be considered a market participant. In *Camps Newfound/Owatonna,* the Court held that a Maine property tax exemption scheme for charitable institutions incorporated in Maine did not fall within the market participant

exception to the Commerce Clause because it excluded organizations operated principally for the benefit of nonresidents. Creating a tax program to subsidize a particular industry, such as charitable and benevolent institutions, is not a proprietary activity nor the "sort of direct state involvement in the market that falls within the market-participation doctrine." *Id.* at 1606-07. Further, the Court noted that the tax exemption statute swept far more broadly than the narrow, discrete activities at issue in *Alexandria Scrap* and *Reeves*. Hence, the tax scheme "must be viewed as action taken in the State's sovereign capacity rather than a proprietary decision to make an entry into all of the markets in which the exempted charities function." *Camps Newfound/Owatonna* at 1607. *See also New Energy Co.,* 486 U.S. 269, 277, 278 (1988) (holding Ohio's assessment and computation of fuel sales tax was a "primeval governmental activity" that "cannot plausibly be analogized to the activity of a private purchaser," even if it produces a subsidy).

*Camps Newfound/Owatonna* is hardly support for Red River's position. If the public funds that paid for the construction projects in Boston did not trigger application of the Commerce Clause in *White,* then surely the public funds that paid for the creation and maintenance of the Minot landfill will not trigger it either. In deciding to limit access to its landfill to residents and grandfathered entities, Minot has not engaged in the sweeping regulation characteristic of "a State[] acting in its distinctive governmental capacity," *New Energy Co.,* 486 U.S. at 277, but instead is functioning in a true proprietary capacity. Minot is running a trash disposal business involving one landfill it has built and maintained. It does not attempt to manage the flow of waste outside of its geographic market. It does not impose conditions that "have substantial regulatory effect outside of [its] particular market." *Wunnicke,* 467 U.S. at 97. It does not keep out waste haulers or processors that might seek to enter the Minot market. It does not even dictate that residents of Minot must use the landfill for their trash, thus laying waste, so to speak, to both Red River's "primeval governmental activity" and "regulatory scheme" arguments. As a business, Minot may freely choose the parties to whom it wishes to sell space in its landfill.

Red River also argues that the market participation doctrine should not apply because Minot is hoarding a scarce natural resource: space in a landfill. The Supreme Court noted in passing in *Alexandria Scrap* that the right of states to claim the market participation exemption might be limited if they "hoard resources which by happenstance are found there." 447 U.S. at 444. In *Reeves,* however, the Court applied the market participation doctrine even though South Dakota was restricting purchase of a nationally scarce commodity it produced -- cement -- to its own residents. Similarly, the Court upheld Nebraska's scheme to control the sale of groundwater since "given [Nebraska's water] conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage." *Sporhase v. Nebraska,* 458 U.S. 941, 957 (1982). If Nebraska could favor its residents in times of ground water shortages simply because of the state's water conservation efforts, then Minot should certainly be able to favor its residents' use of its landfill because of the effort and expense Minot expended in developing the landfill. *See Swin,* 883 F.2d at 253. *See also Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 389-90 (1978) (Montana could charge non-residents substantially more for elk hunting licenses because state devoted resources to elk conservation).

Whether a landfill is a natural resource and whether a natural resources exception exists in a solid waste disposal case as a matter of law are both unclear. *See*, *e.g., Oregon Waste Sys., Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 107 (1994). We decline, however, to find that the Minot landfill is a "happenstance" natural resource that is geologically peculiar to North Dakota such as coal or oil or ground water would be. Siting a landfill requires a convergence of political choices, economic initiatives, environmental demands, and geological realities. Because Minot has expended effort and expense to develop and maintain the landfill, it is a "good publicly produced and owned" in which the city may favor its residents.

Finally, Red River earnestly argues that the outcome of this case should be governed by "flow control" cases rather than the market participant doctrine. When a state enacts a flow control measure, it attempts to manage the waste stream for some public good, usually to finance local disposal and processing facilities or to protect the environment by extending the useful life of landfills. However, if the measure is also a protectionist measure that deprives competitors, whether in-state or out-of-state, of access to a local market, then the measure violates the Commerce Clause. *Philadelphia v. New Jersey,* 437 U.S. 617 (1978); *C&A Carbone, Inc. v. Clarkstown,* 511 U.S. 383 (1994).

Red River's reliance on the many flow control cases it cites in its brief is unfounded since those cases deal with fundamentally different factual settings than the present situation. For example, in *Carbone,* Clarkstown built a new solid waste transfer station to receive bulk solid waste and to separate recyclable from nonrecyclable waste. To guarantee that the amount of waste coming into the new station would be sufficient to pay for the cost of its construction, Clarkstown enacted an ordinance requiring that all nonhazardous solid waste generated within the town be deposited in the new transfer station. Waste processors and recyclers in the town who received bulk solid waste brought suit because under the ordinance their only option was to send the nonrecyclable solid waste to the transfer station for processing and then to pay a tipping fee for this waste from which they had already removed the recyclable materials. They could no longer ship their nonrecyclable solid waste to cheaper processors in other locales. The Court held that this local processing requirement discriminated against interstate commerce. Such discrimination is per se invalid unless the state or municipality "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id*. at 392. Clarkstown protested that the ordinance addressed health and environmental problems, but the Court noted that "any number" of nondiscriminatory alternatives could achieve the same effect without obstructing the flow of interstate commerce. *Id.*

In most flow control cases, the challenged state or local regulations intrude on transactions between willing third-party buyers and third-party sellers of waste materials or disposal services. *See, e.g., Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat'l Resources,* 504 U.S. 353 (1992) (invalidating as a protectionist measure statute banning unauthorized acceptance of waste from outside a county because it protected local waste producers from competition from out-of-state producers seeking to use local disposal areas); *Waste Sys. Corp. v. Martin County,* 985 F.2d 1381 (8th Cir. 1993) (holding ordinances requiring delivery of all in-county compostable solid waste to counties' facility violated Commerce Clause because ordinances discriminated against interstate commerce by insulating the facility from competition with cheaper out-of-state alternatives); *Diamond Waste, Inc. v. Monroe County,* 939 F.2d 941(11th Cir. 1991) (holding county resolution banning new operator from importing any out-of-county waste into the county's landfill violated Commerce Clause because alternative measures could have achieved county's goals with less effect on interstate commerce). But here, no third-party seller exists. Minot is itself the seller -- a market participant in the waste disposal business. Red River seeks to buy space in Minot's landfill for the MAFB waste, but Minot simply does not wish to sell to Red River. Minot has in no way discriminated against the "flow" of interstate commerce. Because we find that the market participation doctrine applies, we do not need to further discuss whether Minot's policy has a discriminatory effect on interstate commerce.[5] We hold that it does not.

IV.

---

[5]For an interesting discussion applying the market participant doctrine to a flow control ordinance, see *Barker Bros. Waste, Inc. v. Dyer County Legislative Body,* 923 F. Supp. 1042, 1054 (W.D. Tenn. 1996). The court observes that for the doctrine to apply to such an ordinance, "the governmental entity must participate in both the trash hauling business and the trash disposal business."

Red River argues that Minot's decision to refuse Red River's MAFB municipal solid waste violates its equal protection rights under the Fourteenth Amendment because Minot's decision on its face discriminates against out-of-city waste processors and haulers. Red River believes that the "rigorous scrutiny" standard described in *Carbone* should invalidate Minot's decision since other less discriminatory methods of achieving Minot's goals of preserving space in its landfill exist. Given our decision in the preceding section that Minot has not discriminated against the "flow" of interstate commerce, we disagree that the "rigorous scrutiny" standard applies in this situation. Minot has neither targeted nor excluded a suspect class with its decision, *Independent Charities, Inc. v. Minnesota,* 82 F.3d 791, 797 (8th Cir.), *cert. denied,* 117 S. Ct. 982 (1996), nor impinged on a fundamental interest, *Swin,* 883 F.2d at 255, so any review using a "strict" or "rigorous" scrutiny standard would be inappropriate. Instead, we find that the rational basis standard governs Red River's equal protection challenge. *Alexandria Scrap,* 426 U.S. at 813-14. Under this standard, legislation is presumed valid if the classification drawn by the legislation is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440 (1985). Red River has the burden of proving "that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational." *Chance Mgt., Inc. v. South Dakota,* 97 F.3d 1107, 1114 (8th Cir. 1996), *cert. denied,* 117 S. Ct. 1083 (1997) (citing *City of Cleburne,* 473 U.S. at 446). Red River must also negate "every conceivable basis which might support" the classification. *Independent Charities,* 82 F.3d at 797 (citing *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315 (1993)). Red River has not carried its burden.

The record clearly demonstrates that the Minot City Council has struggled since 1993 with difficult landfill issues. Its decision to no longer accept municipal solid waste from anyone but its residents and existing customers is rationally related to its goal of preserving the useful life of its landfill for its residents, even though potential new customers, out-of-city haulers and processors like Red River, are excluded. After all,

"[a]ny hole, no matter how large, can only accept a specific volume of garbage." *Swin,* 883 F.2d at 256. The preference created for existing customers does no more than recognize and protect their reliance interest. *See New Orleans v. Dukes,* 427 U.S. 297, 304-306 (1976) (holding grandfather provision of an ordinance prohibiting food sales by pushcart vendors in the French Quarter did not violate the Equal Protection Clause because the ordinance was rationally related to the purpose of preserving the area's appearance and customs).

V.

Finally, Red River claims 1) that Minot is estopped from denying that it has a contract with Red River to accept delivery of MAFB municipal solid waste at the Minot landfill, and 2) that Minot has breached that contract. Neither the facts nor the law supports those claims.

Red River claims that an oral contract was created when it obtained quotes on tipping fees from the city for municipal solid waste. The district court ruled, however, that such a contract would be void under the North Dakota statute of frauds which makes invalid any oral contract "that by its terms is not to be performed within a year from the making thereof." N.D. Cent. Code § 9-06-04 (1997). The court said that any contract between Red River and the city obviously could not be performed in a year because it would be co-terminous with the five-year contract between Red River and MAFB.

No signed writing exists here but Red River argues that part performance of the oral contract removes it from the statute of frauds. *Poyzer v. Amenia Seed & Grain Co.,* 409 N.W.2d 107, 111 (N.D. 1987). We find no such part performance. The existence of an oral contract is always a question of fact. *Johnson Farms v. McEnroe,* 568 N.W.2d 920, 924 (N.D. 1997). The city concedes that someone in the public works department may have given Red River a quote on tipping fees while Red River

-14-

was preparing its bid for the MAFB contract since many parties call the department requesting information about tipping fees and Red River may have been one of them. The city never had any formal communication with Red River about landfill rates or access, however, until after Red River had been awarded the MAFB contract. Aff. of Alan M. Walter, J.A. at 194. While the city accepts Red River's inert waste, the dispute here has, from the beginning, concerned only municipal solid waste from MAFB. Since Minot never allowed Red River to deposit any municipal solid waste in the Minot landfill, even before formally denying its request in December 1996, Red River could not have partially performed an oral contract to deposit municipal solid waste in the landfill. No such contract existed, despite statements to the contrary in the affidavit of Red River's president. Aff. of James Smith, J.A. at 45.

Red River also urges us to find that the city should be estopped from denying that a contract exists between it and Red River for the disposal of MAFB's solid municipal waste. Even in the unlikely event we were to find that Red River could successfully bring an estoppel suit against a governmental body such as the City of Minot, *see Blocker Drilling Canada, Ltd. v. Conrad,* 354 N.W.2d 912 (N.D. 1984) -- a question we need not decide -- estoppel simply does not exist on these facts. Under North Dakota law, the party claiming estoppel must prove that: 1) it did not and could not know the truth of the facts in question; 2) it relied, in good faith, upon the conduct or statements of the party to be estopped; and 3) based on that reliance it acted or did not act with the result that it changed its position or status, to its injury, detriment, or prejudice. *Id.* at 920.

Red River's claim that the city should be estopped from denying the contract is apparently based on an October 21, 1996, letter that the Minot Director of Public Works, Alan M. Walter, sent to Red River following its request to put MAFB's municipal solid waste in the Minot landfill. In the letter, Walter wrote:

You have requested the use of the City of Minot landfill for hauling municipal solid waste from the Minot Air Force Base. We have researched the record on this request and find that the City Council did not take any formal action with regards to limiting solid waste from what was then Region II in North Dakota. At this time, I cannot state that you can not [sic] bring the solid waste to our landfill.

I am sending your letter and a memo to the City Council with your request. In the memo I have explained the history of the use of our landfill and the comments made in 1994 about the use of the landfill with regard to Region II.

The Public Works Committee of the City Council meets on October 31, 1996.

At this point there is no council action prohibiting the use of the landfill for Minot Air Force Base. If you need further information or have further information, please contact me.

J.A. at 70. Just as it was impossible to find an oral contract in the possibility that the city had quoted rate information to Red River over the phone, it is difficult to find in this letter anything to support a claim of estoppel. On its face, the letter nowhere contains a clear statement of permission or invitation. The letter nowhere "welcomed RRSC's [Red River's] business," as Red River claims. Appellant's Br. at 11. The letter nowhere states terms, conditions, rates, or other information one would expect in a letter creating a contract. Red River had been in the Minot area long enough to have bid a contract with MAFB -- certainly long enough for a national waste disposal business to be charged with the knowledge that the city council was frequently and publicly discussing landfill issues. Red River can hardly claim that it did not know or could not have found out that Minot was contemplating limits on access to the landfill.

Further, no reasonable entrepreneur would rely on the hesitant and ambiguous language in the letter that the public works director sent to Red River. Walter wrote that his research of the record showed that the Minot City Council had not taken "formal" action on limiting solid waste disposal in the landfill. For eyes that will see, this language indicates that something had happened in Minot -- perhaps some "informal" action. In the very next sentence, Walter qualifies this absence of "formal action" by telling Red River that "[a]t this time, I cannot state that you can not bring solid waste to our landfill." At the very least, this sentence, however unartfully phrased, should have caused Red River to inquire further about whether Minot was planning formal action that would prevent Red River from bringing the MAFB solid municipal waste to the landfill, especially given Walter's statement in the next paragraph that he would be sending Red River's request on to the city council, a clear indication that he did not have the authority to grant Red River access to the landfill. *See also* Aff. of Alan M. Walter, J.A. at 194-5. Moreover, Walter's affidavit indicates that Red River had actual notice that the city would not accept the MAFB municipal solid waste.

> Red River could not in good faith have interpreted my letter of October 21, 1996, as implicit acceptance of its waste stream, for at the same time as I was saying therein that 'I cannot state' that its waste was prohibited, I certainly was not allowing them to use the landfill! They well knew I wasn't allowing them to use the landfill (except for inert construction wastes) as evidenced by their repeated and vigorous complaints to me about their exclusion.

J.A. at 193. Red River considerably overstates its case with the comment that "Minot had a duty to speak out, rather than lulling an out-of-state citizen into a position of

detriment." Appellant's Br. at 45. Because it did not like the message, Red River simply failed to hear what the City of Minot was telling it.

VI.

For the foregoing reasons the judgment of the district court is affirmed in its entirety.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.